**Azam S. ALI, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 83–858.**

District of Columbia Court of Appeals.

Argued May 8, 1985.
Decided Jan. 26, 1987.

Randy Hertz, Public Defender Service, with whom James Klein, Public Defender Service, was on brief, for appellant.

Azam S. Ali entered a pro se appearance.

Mary Ellen Abrecht, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty., were on brief, for appellee.

Before PRYOR, Chief Judge, and MACK and ROGERS, Associate Judges.

MACK, Associate Judge:

Azam S. Ali appeals his convictions of carnal knowledge, D.C.Code § 22–2801 (1981), sodomy with a child, *id.* § 22–3502, indecent liberties, *id.* § 22–3501(a), and enticing, *id.* § 22–3501(b). He contends that the trial judge erred when he admitted certain "other crimes" evidence regarding allegations of sexual abuse committed by the appellant against the younger sister of the complaining witness. He also asserts that his trial was tainted by the admission of other irrelevant and inflammatory testimony, by improper examination of witnesses, and by the prosecutor's unduly prejudicial closing argument. We agree that the challenged uncharged misconduct evidence was inadmissible, that improperly suggestive questions were asked, and that overstated or impermissible closing argument was used. We also find sufficient preju-

dice from the improperly admitted "other crimes" evidence to warrant the reversal of appellant's convictions.

## I

Even the admissible evidence does not present a pretty picture. The government introduced testimony from the complaining witness, S.S., who was seventeen years old at the time of trial. At the time of the charged offenses, appellant was the boyfriend of the mother of S.S.; he spent much time in the two-bedroom apartment which S.S., her younger sister F.W., brother, and mother shared with yet another family. In fact, the mother of S.S., who was away from the apartment every weekday from early morning until 6 p.m., had given appellant responsibility for the education and discipline of her children.

S.S. testified that the first incident of alleged sexual abuse occurred when she was thirteen years old.[1] On a summer day in 1979, appellant went to the apartment to check on the children. He ordered the brother of S.S., the younger sister (F.W.), and another child (R.R.) to go outside. He entered the bedroom which S.S. shared with her siblings and mother, sat on the bed, and instructed S.S. to disrobe and stand in front of him. S.S. removed all her clothing except her underpants. Appellant touched her shoulders and chest, "checking [her] over." He threatened to murder S.S. if she told anyone.

The next event described by S.S. occurred during the following school year. On a day when S.S. was alone at home later than usual, appellant arrived on the pretext of helping her search for lost keys. He engaged in intercourse with the young girl before driving her to school. According to S.S., appellant thereafter engaged in sexual activity with her "like two times a week." This usually occurred in the apartment, although on one occasion, in September or October of 1980, appellant took S.S.

to his home where they engaged in sodomy and intercourse.

S.S., F.W., and R.R. all testified that on July 4, 1981, appellant came to the apartment. He ordered the other children to stay in the bedroom and took S.S. into the bathroom. S.S. said that there appellant had intercourse with her. S.S. was sure that the incident occurred on July 4 because she related it to a special dinner her mother had prepared and to the traditional fireworks display; R.R. was certain of the date appellant took S.S. into the bathroom because it was his mother's birthday. However, the counts charging offenses related to this event were dismissed after appellant presented evidence—including airplane ticket stubs and passports with entry and exit stamps—that proved that he was not present in the United States on July 4, 1981.

S.S. also testified about three other incidents of sodomy and sexual intercourse initiated by appellant during July, 1981. Shortly after their last encounter, S.S. ran away to Ocean City, Maryland. After talking with counselors at a runaway house there, she called her mother and returned to the District of Columbia where she told her story of abuse to an aunt and made a formal report to the police.

Appellant took the stand to admit having a close relationship with the children and their mother but to deny the charged sexual abuse. He presented the testimony of a dozen other witnesses including his wife and four character witnesses.

## II

Appellant claims here that he has been fatally prejudiced by the erroneous admission of testimony about his alleged sexual conduct with F.W., the younger sister of S.S. We agree.

---

1. Although this incident was the subject of indictment, a motion for judgment of acquittal was granted.

## A.

Over appellant's objection at a pretrial hearing, the government obtained the court's permission to introduce the uncharged misconduct evidence for the limited purpose of showing a "common scheme or plan." Thus S.S. was permitted to testify that a "few times," when F.W. came out of the bathroom clad in a towel, appellant, "will call her and he will say what's down there to her private and she—she—will point and he will touch her on her breasts." F.W. likewise testified that "more than three" times "when I come out of the bathroom, you know, I would have a towel on, you know, that kind of way, and I have on my panties and vest, too, and then he would—one time he was at the table and told me to 'Come here' and I walked to the table slowly and then he said, then he start feeling on my breast. Then he said, he pointed, and said '[W]hat's down there?'"

After appellant had taken the stand to deny the charges against him, the prosecutor, during cross-examination, referred to the testimony about F.W., and asked "Is it normal for the mother's boyfriend when a nine-year-old girl comes out of the bathroom to pull aside her towel and touch her on the breasts and point to her private area?"

In his closing argument, the prosecutor emphasized the testimony:

And based on that testimony and also based on not only what happened to [S.S.] ladies and gentlemen, but what the defendant began to do with [F.W.]; she began to develop, how he would pull her towel apart and look down and fondle her breasts and point down at her private area. And then he gets on the stand and says, "Oh, that is perfectly normal, that is what all mothers' boyfriends do." [2] Well, ladies and gentlemen, that is not perfectly normal. That's not what all mothers' boyfriends do. That's what this man did because he lusted after

those children. He wanted to dominate those children. This was no act of love. This was an act of domination over those children, to maintain control over them, maintain control over their mother. And, ladies and gentlemen, he is guilty.

At the end of the trial, the court cautioned the jurors that they were to consider the evidence of appellant's conduct with F.W. only:

[F]or a very narrow purpose and for no other reason. This evidence was admitted for your consideration as to whether it showed or tends to show that Mr. Ali had a scheme or plan which included the offenses with which you are asked to consider. You're not required to accept this other evidence. And whether you accept it or not is for you to decide. But if you decide to accept it, you may do so only for this limited purpose, that is that he had a scheme or plan which included the offenses with which he is now on trial. You may not consider it as tending to show in any other way his guilt of the offenses for which he is now on trial.

## B.

The long-standing doctrine excluding evidence of misconduct or crimes independent of the charged crimes responds to several fundamental principles of our legal system: a person is tried only for those crimes with which he has been charged; the penalties of criminal law are appropriately imposed only for the unlawful activity charged, not for bad character or predisposition; admissible evidence at trial is generally limited to proof of the historical events which form the bases of the charges. Thus, courts exclude evidence of uncharged misconduct or crimes recognizing the presumptive irrelevance and prejudice of such evidence. It is *not* that such evidence inherently lacks probative value; it is rather that the uncharged collateral acts are simply uncon-

---

**2.** In fact, appellant had responded to the question not by claiming that such conduct was normal, but by denying the incidents.

nected to the historical events of the charged crimes and highly prejudicial.[3] *See* Slough, *Other Vices, Other Crimes,* 20 KAN.L.REV. 411, 416 (1972).

■ The presumption of inadmissibility can be rebutted only when the proponent of such evidence demonstrates the materiality and relevance of the evidence. Therefore, the proponent must: "(1) identify the consequential fact to which the proffered evidence of other crimes, wrongs or acts is directed ... (2) prove the other crimes, wrongs or acts ... and (3) articulate precisely the evidential hypothesis by which the consequential fact may be inferred from the proffered evidence." 2 J. WEINSTEIN, EVIDENCE ¶ 404[08] (1986).[4] After the proponent has made these showings, the trial court must still independently determine whether the prejudicial value of the evidence outweighs its probative value. *Graves v. United States,* 515 A.2d 1136, 1139 (D.C.1986) (citing *Campbell v. United States, supra,* 450 A.2d at 430); *Minick v. United States,* 506 A.2d 1115, 1119 (D.C.), *cert. denied,* — U.S. —, 107 S.Ct. 133, 93 L.Ed.2d 76 (1986).

The leading case in this jurisdiction, *Drew v. United States, supra* note 4, 118 U.S.App.D.C. 11, 331 F.2d 85, enumerates the specific "evidential hypotheses" by which a contested fact may be inferred. Evidence of uncharged crimes or misconduct may be admitted when logically relevant to prove motive, intent, absence of mistake or accident, a common scheme or plan, or the identity of the perpetrator. *Id.* at 16, 331 F.2d at 90 (footnote omitted). Here, the government argued that the independent acts of alleged misconduct were "demonstrative of a common scheme or plan of action on the part of this defendant."

■ Where charges in an indictment or complaint involve discrete acts of misconduct, allegations of a common scheme or plan are not *directly* relevant to prove one or more of the contested elements of the charges. *See Graves v. United States, supra,* 515 A.2d at 1140 (since appellants' motives were not an element of the charged offenses of inviting for purposes of prostitution, the motive exception could not properly serve as a basis for admissibility). Under the other crimes evidence doctrine, no intrinsic relevance inheres in an allegation of a common scheme or plan. Therefore, common scheme or plan evidence is inadmissible unless the proponent specifically identifies the contested element of the charged crime which the common

---

**3.** The prejudice inherent in such evidence may manifest itself in a variety of ways. The most obvious problem is that the jury may use evidence of one crime to infer a criminal disposition on the part of the defendant which in turn results in a finding of his guilt on the other charges. *See Crisafi v. United States,* 383 A.2d 1, 3 n. 2 (D.C.), *cert. denied,* 439 U.S. 931, 99 S.Ct. 322, 58 L.Ed.2d 326 (1978). The jury may also cumulate the evidence of the various crimes and find the defendant guilty of the charged offense although guilt might not have been found if evidence of the uncharged offense had not been presented. *Id. See also United States v. Bussey,* 139 U.S.App.D.C. 268, 270, 432 F.2d 1330, 1332 (1970). As one commentator has noted, "[I]t remains an unalterable fact that members of the jury, supposedly of nobler root, will lend excessive weight to a record of misdeeds and crime." Slough, *supra,* 20 Kan.L.Rev. at 426; *see also Crisafi v. United States, supra,* 383 A.2d at 3 n. 2 (jury more hostile toward defendant charged with multiple offenses than toward defendant charged with one offense).

**4.** These three requirements have been variously stated throughout the case law of this jurisdiction: (1) the issue to which the evidence is said to be relevant must be the subject of genuine controversy, *e.g., Campbell v. United States,* 450 A.2d 428, 430 (D.C.1982); *Willcher v. United States,* 408 A.2d 67, 76 (D.C.1979); (2) the government must prove by clear and convincing evidence that the defendant was the perpetrator or co-perpetrator of the uncharged crime, *see, e.g., Light v. United States,* 360 A.2d 479, 480 (D.C.1976); *United States v. Bussey, supra,* 139 U.S.App.D.C. at 273, 432 F.2d at 1335; and (3) the uncharged misconduct evidence must be logically relevant to the contested issue for a reason independent of its power to demonstrate propensity. *E.g., Drew v. United States,* 118 U.S.App.D.C. 11, 331 F.2d 85 (1964).

scheme or plan evidence *inferentially* proves.[5]

■ Identification of the contested issue here demonstrates that the introduction of the other crimes evidence generated the impermissible "propensity" inference forbidden by *Drew*. Since S.S. was indisputably under 16 years old, and since appellant did not interpose mistaken identification or lack of intent as defenses, the actual occurrence of the unlawful sexual acts with S.S. was the contested issue. *See* note 5 *supra* (listing the elements of the charges). Evidence that appellant allegedly unlawfully touched F.W. on three to five occasions is relevant to charges that appellant engaged in sexual intercourse and sodomy with an entirely different individual on separate occasions only by means of one inference: because appellant did so with F.W., he did so with S.S. That is precisely the "propensity" inference forbidden by *Drew*. *See, e.g., Gordon v. United States*, 127 U.S. App.D.C. 343, 347, 383 F.2d 936, 940 (1967) (describing "the inevitable pressure on lay jurors to believe that 'if [the defendant] did it before he probably did so this time' "), *cert. denied*, 390 U.S. 1029, 88 S.Ct. 1421, 20 L.Ed.2d 287 (1968).

The true nature of the government's argument was obscured because the proper sequence of logical inferences was inverted. The government in effect argued that appellant's alleged conduct with F.W. and his alleged conduct with S.S. established a common scheme or plan. The common scheme or plan, rather than the particular acts charged in the indictment, became the ultimate inference. While this perhaps created the illusion of compliance with the "common scheme or plan" exception, the ultimate inference generated by other crimes evidence must always be the defendant's greater likelihood of guilt on a contested issue in the case.

Success at this inversion was due at least in part to the manner in which the terms of appellant's alleged plan were broadly generalized. The government claimed that appellant desired to dominate S.S. and F.W. in order to maintain control over their mother. Characterizing a plan in terms of a general bad motive may be probative of an accused's *status* as a bad person, but if there is no inference of a specific plan in the accused's mind which interconnects the uncharged and charged acts, then the other crimes evidence is offered for nothing other than the accused's propensity to commit a series of similar but discrete bad acts.

■ A pattern or systematic course of conduct is insufficient to establish a plan:

> Indecent Liberties: (1) the defendant (2) took or attempted to take immoral, improper, or indecent liberties or committed or attempted to commit a lewd or lascivious act upon or with the body or some part or member thereof (3) of a child under 16 (4) with specific intent of arousing, appealing to, or gratifying the lust or passions or sexual desires, either of the defendant, the child, or both;
>
> Enticement: (1) the defendant (2) for the purpose of taking immoral, improper, or indecent liberties or for the purpose of committing any lewd or lascivious act upon or with the body or some part or member thereof, enticed, allured or persuaded to a place (3) a child under 16 (4) with the specific intent of arousing, appealing to or gratifying the lust or passions or sexual desires either of the defendant, the child, or both.

Criminal Jury Instructions for the District of Columbia, Nos. 4.71 (Carnal Knowledge), 4.79 (Sodomy), 4.77 (Indecent Liberties and Enticement for Purpose of Taking Indecent Liberties) (3d ed. 1978).

---

5. The phrase "common scheme or plan" as used in the other crimes evidence doctrine must be distinguished from situations in which a "common scheme or plan" constitutes an element of the charged crime and thus is admissible upon a theory of direct relevance. For example, evidence of a common scheme or plan provides direct proof of one of the elements of a crime such as conspiracy. By contrast, the elements of carnal knowledge, D.C.Code § 22–2801 (1981), sodomy, *id.* § 22–3502, indecent liberties, *id.* § 22–3501(a), and enticement, *id.* § 22–3501(b), do not involve proof of a plan. The elements are as follows:

> Carnal Knowledge: (1) the defendant (2) engaged in sexual intercourse (3) with a female child under 16;
>
> Sodomy (in relevant part): (1) the defendant (2) took the sex organ of another person into his or her mouth or placed his or her sexual organ in the mouth of another person or had carnal copulation with another person in an opening of the body except the sexual parts and (3) the person was under 16;

Standing alone, a series of similar acts does not establish the existence of a true plan. A series of similar robberies could be the result of separate decisions to rob. There must be a permissive inference that both crimes were related to an over-all goal in the defendant's mind.

E. IMWINKELRIED, UNCHARGED MISCONDUCT EVIDENCE § 3:22, ch. 3 at 58 (1984) (footnotes omitted) (hereinafter "IMWINKEL-RIED"). The distinguishing characteristic of the common scheme or plan exception to inadmissibility is the existence of a true plan in the defendant's mind which includes the charged and uncharged crimes as stages in the plan's execution: the series of crimes must be mutually dependent. *Id.* § 3:21, ch. 3 at 53, 54. Completely dissimilar crimes may form part of a true plan or scheme. *Id.* at 53. Likewise, similar crimes are often not admissible under the common scheme or plan theory of relevance. *Id.* § 3:23, ch. 3 at 62; 2 WIGMORE ON EVIDENCE § 304 at 249 (Chadbourn rev. 1979).

A good example of the proper use of the common scheme or plan theory of relevance is provided in *Hackney v. United States*, 389 A.2d 1336 (D.C.1978), *cert. denied*, 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 95 (1979), in which the identity of the perpetrator of a series of murders was a contested issue. The government's evidence that the accused committed the series of murders as part of a plan to cover up an original murder would have been properly admitted at separate trials because the common scheme or plan evidence inferentially proved the perpetrator's identity: the

existence of the cover-up plan raised the probability of the appellant's participation by setting him apart from other persons who had no such plan. *See* IMWINKELRIED, *supra*, § 3:20, ch. 3 at 50. Furthermore, the subsequent murders demonstrated a true plan in the accused's mind to cover up the original murder; *but for* the original murder the subsequent murders would not have taken place. The situation here, in which the accused has allegedly committed a series of similar but non-interlocking crimes, is thus distinguishable from the true common scheme or plan case of *Hackney*.[6]

### C.

The government is in no better position when it argues on appeal that the other crimes evidence was relevant to show the defendant's disposition to commit an unusual sex offense. This argument was not made at trial, and we decline to retroactively approve the ruling of the trial judge on the basis of a rationale that he did not apply and whose applicability was not open to challenge by the defendant.[7] Such approval would be particularly inappropriate here where appellant specifically, although unsuccessfully, objected at trial to the justification offered at that time by the government. Moreover, the theory of protective limiting instructions would be rendered meaningless if the admission of such highly prejudicial evidence is subsequently upheld on grounds other than those adopted by the trial judge. We are thus met in this case with a situation in which

---

**6.** The *Hackney* case represents the admission of common scheme or plan evidence based upon the strong inference of an inter-connected chain of crimes. Under the "chain" theory, a series of crimes of roughly equal magnitude are seen as necessary steps in the accomplishment of a specified goal such as covering-up a murder or eliminating rival heirs to an inheritance. IM-WINKELRIED, *supra*, § 3:22, ch. 3 at 57. By contrast, admissibility based upon an inference of a sequence of inter-connected crimes, in which earlier crimes lay the foundation for the charged crime, is illustrated by the classic example of the defendant who steals the gun which is subsequently used to carry out the primary

crime. *Id.* (citing Stone, *The Rule of Exclusion of Similar Fact Evidence: America*, 51 HARV.L. REV. 988, 1009 (1938)).

**7.** Indeed, this court last approved the introduction of evidence "to show the intent and lustful disposition of the defendant," *Dyson v. United States*, 97 A.2d 135, 137 (D.C.1953), before the decision in *Drew, supra*, in which the circuit court announced firmly "that evidence of one crime is inadmissible to prove *disposition* to commit crime." *Id.* at 15, 331 F.2d at 89 (emphasis in original).

evidence was improperly admitted, the jury was not properly instructed, and the government now changes its argument on appellate review. We would be hard-pressed to call this error harmless.

## III

Appellant also argues cumulative prejudice as a result of the prosecutor's alleged attempt, through improper questioning, to place before the jury other instances of misconduct.

■ It is a generally accepted principle that the government may not attempt to manufacture evidence by creating an impression in the minds of the jurors through questions that imply the existence of facts. Questions assuming the existence of a factual predicate must be grounded in a good faith belief that those facts are susceptible to proof by competent evidence. B. GERSHMAN, PROSECUTORIAL MISCONDUCT § 9–4(a) (1986); 6 WIGMORE ON EVIDENCE § 1808(2) (Chadbourn rev. 1979). *See also United States v. Silverstein,* 737 F.2d 864, 868 (10th Cir.1984); *United States v. Harris,* 542 F.2d 1283, 1307 (7th Cir.1976), *cert. denied,* 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977); *United States v. Brown,* 519 F.2d 1368, 1370 (6th Cir.1975); STANDARDS FOR CRIMINAL JUSTICE § 3–5.7(d) (2d ed. 1980).

### A.

Appellant points first to the prosecutor's cross-examination of his wife, Janet Ali, who had testified on direct that appellant's affair with the mother of S.S. had taken place when she and her husband were spending little time together and their marriage was undergoing great stress. The prosecutor asked Mrs. Ali if she was aware that, even at the time of trial, appellant was having an affair with defense witness Shirley Kumar:

Q. Now, after—just prior to the time that [S.S.'s mother] died and even now Mr. Ali's having an affair with somebody else, isn't he?

A. No, not to my knowledge.

Q. You don't know about him and Shirley Kumar?

A. Shirley Kumar? No, he's not having an affair with Shirley Kumar.

Q. Are you certain about that?

A. Yes, I'm certain.

Q. Did you know about the fight that [S.S.'s mother] and Shirley Kumar had just before she died over Mr. Ali?

A. No, I'm not aware of any fight, Mr. Myers.

Q. You are not aware of that?

A. No, Mr. Myers.

During rebuttal, the government called two witnesses to testify about appellant's relationship with Mrs. Kumar. Mr. Kumar testified that he and his wife separated two weeks before the trial, after he had heard rumors that she was having a relationship with someone else. R.R.'s mother testified that she heard the mother of S.S. speaking on the telephone with a person identified by the mother of S.S. as Shirley Kumar. During the conversation, S.S.'s mother asked Shirley Kumar whether she was having an affair with appellant.

■ Here, the questions put to appellant's wife about her knowledge of a rumored extramarital affair between appellant and one of the defense witnesses were improper, as was the subsequent admission of testimony designed to demonstrate the existence of the relationship. The government argues that evidence of the existence of such a relationship was offered only "to show how much Mrs. Ali was willing to endure and thus how partial she was to appellant." Therefore, the government contends, the question itself was proper as well as the admission of the subsequent rebuttal testimony. However, there is no logical connection between the affair and the credibility of Mrs. Ali unless Mrs. Ali knew about the affair. No evidence in the record suggests a basis for believing that Mrs. Ali had any knowledge of the relationship or of gossip about its existence. Consequently, it was misconduct for the prosecutor to ask the question in the first in-

stance, and further misconduct for him later to introduce evidence of rumors in the community about the alleged affair.[8]

As the trial judge observed when he agreed to instruct the jury to ignore this evidence, the colloquies in question imply that appellant was "some sort of a Don Juan ... making out with everything in town from Guyana."[9] The danger of prejudice is especially great in a case such as this, which by its very nature is fraught with emotional overtones. "[B]ecause this evidence should never have gone before the jurors, there [is] no necessity to indulge in the questionable assumption that their awareness can be partially erased...." *Williams v. United States*, 382 A.2d 1, 7 (D.C.1978). Furthermore, the curative instruction, given at the end of twenty pages of instructions in the transcript, did not alleviate the impermissible prejudice. *Id.*

### B.

Finally, for the first time on appeal, appellant challenges other cross-examination by the prosecutor which appellant claims laid the foundation for unfounded allegations that he "suborned perjury and influenced defense witnesses."

Appellant called two alibi witnesses to testify as to his whereabouts during one of the July 1981 incidents. The prosecutor cross-examined one of those witnesses, Robbie Paul, as follows:

8. Moreover, even if we assume appellant had been engaged in such an affair with the knowledge of his wife, this testimony was of little probative value. It was already obvious to the jury that Mrs. Ali was aware of her husband's relationship with the mother of S.S. In spite of this knowledge she continued her marital relationship with appellant and testified on his behalf at trial. Any bias on her part was manifest and needed no further demonstration. Therefore, its probative value was minimal compared to its prejudicial impact. *Cf. Tinker v. United States*, 135 U.S.App.D.C. 125, 127, 417 F.2d 542, 544 (counsel is accorded only a "reasonable opportunity" to explore bias of adverse witnesses), *cert. denied*, 396 U.S. 864, 90 S.Ct. 141, 24 L.Ed.2d 118 (1969).

Q. Weren't you—when you were out in the hall yesterday afternoon were you talking to another man?
A. [No response.]
Q. For a little while yesterday afternoon?
A. I can't remember.
Q. Well, didn't you and another man have a conversation in which you and he were talking about this party and you and he were saying "Mr. Ali wants me to say I was at this party, but I can't remember because I was too drunk?"
A. No.
[Defense Counsel]: Objection.
[Prosecutor]: You didn't say that?
A. No.
Q. You didn't say that not noticing that Detective McGinnis was just a few feet away and overhearing what you said?
A. I did not say that.

    *      *      *      *      *      *

Q. Were you down in the cafeteria yesterday afternoon?
A. Yes.
Q. When Mr. Ali was down there?
A. I saw him, yes.
Q. Around the lunch break?
A. Yes.
Q. Did he talk to you?
A. We did talk.
Q. Didn't he come to you and say "Remember something—remember I was there, remember this, remember that?"
A. No.

In fact, assessing the relevance and probative value of this type of knowledge is problematical. Contrary to the position of the government, it appears equally probable that a wife with knowledge of her husband's philandering would be motivated to make her testimony on his behalf less, rather than more, favorable to his position.

9. Mrs. Kumar, who described her relationship with appellant as that of brother and sister, had known appellant in Guyana, South America, before they came to this country. S.S., born in Guyana, came to this country when she was nine years old to live with her mother who had come here several years before.

Q. You didn't notice Detective McGinnis being around you at that time either, did you?

A. I don't know who Detective McGinnis is.

When Robbie Paul's brother, David Paul, took the stand as a defense witness, the prosecutor pursued the same line of inquiry:

Q. Were you with your brother when your brother was talking about how Mr. Ali wanted him to remember he was at the party and he could not remember because he was too drunk?

A. No, I was not there.

Q. You were not there? Were you down in the cafeteria yesterday afternoon, shortly after the Court recessed for lunch?

A. Yes, I went down there.

* * * * * *

Q. And were you one of the people that Mr. Ali was coming up to and tried to get them to remember things?

A. No sir.

The government thereafter presented rebuttal testimony from Detective McGinnis. He made no reference to having seen appellant speak to anyone in the courthouse hallways, but stated that he had seen appellant in the courthouse cafeteria "walking up to his witnesses and putting his face right up and say[ing], 'now remember this.'" However, the detective admitted "That's the only thing I overheard."

In closing argument, the prosecutor argued:

[Appellant's witnesses] said "We don't know. How do you expect us to remember that?" And no one asked them about this particular party until just the other day. What do you think is going on? Who is making up testimony? Who is bringing in witnesses to make up evidence? Who is bringing in witnesses to make up stories? Then you hear Mr. Ali—about Mr. Ali down in the lunch room the other day orchestrating witnesses, running from table to table saying "You remember this. Now you remember this don't you? Now you remember this." Who is it that is making up the testimony, ladies and gentlemen? Who is?

It is clear that the detective's rebuttal testimony constituted a slim reed upon which to hang the inferences of appellant's misconduct which the prosecutor placed before the jury.

■ Thus it is that we have questions by the prosecutor suggesting that two separate improper incidents occurred: one in the hallway where a witness was supposedly overheard saying that appellant had asked him to testify falsely and another in the cafeteria where appellant was supposedly seen talking to his witnesses and urging them to "remember." The question about the alleged conversation in the courthouse corridor implied that the detective had overheard a defense witness claiming that appellant had urged him to perjure himself to provide appellant with an alibi. Although the government called this detective in rebuttal, the prosecutor elicited from him no information about this incident. Nor is there any other evidence that suggests such a conversation actually took place. Clearly, asking these apparently baseless questions relating to the alleged hallway conversation constituted prosecutorial misconduct.

■ The prosecutor did elicit from the detective testimony that he had heard appellant say "Now remember this" to witnesses in the cafeteria. The detective had not heard, however, what appellant was asking witnesses to remember. This bit of evidence is hardly a sufficient foundation for the prosecutor's questioning of appellant as to whether this was appellant's "normal" behavior, nor for his argument in closing that appellant was "orchestrating witnesses" and "making up testimony."

The questions about the alleged conversation in the hallway and the argument that exaggerated the content of the remark overheard in the cafeteria insinuated that appellant had attempted to prevent the ju-

rors from performing their function. The implication that appellant was striving to undermine the very fairness and integrity of the judicial process of which the jurors were a part was prejudicial.

## IV

This case is not one in which a single technical error occurred as an isolated event in the course of a trial. Rather, we are confronted here with a situation in which highly prejudicial uncharged misconduct evidence was erroneously admitted. Furthermore, questions by the prosecutor injected irrelevant and inflammatory allegations of additional sexual misconduct by appellant. Finally, the prosecutor sought to portray appellant as someone so unscrupulous that he would not hesitate to undermine the integrity of his trial to gain an acquittal. It is impossible to say with fair assurance after a careful review of the entire record that the judgment was not "substantially swayed" as a result. *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). Therefore, appellant's convictions must be reversed.

*Reversed and remanded for proceedings consistent with this opinion.*

PRYOR, Chief Judge, concurring:

Appellant advances three primary assertions of error: (a) that the prosecutor's questions and argument regarding purported conversations between appellant and his witnesses were improper; (b) that cross-examination of appellant's wife about her knowledge of her spouse's alleged adulterous behavior was inflammatory; and lastly (c) that evidence offered by the prosecution to show sexual molestation of complainant's younger sister should not have been admitted.

Although I am not persuaded that appellant's first two contentions warrant reversal, I agree that the government's use of "other crimes" evidence was error which should not be deemed harmless.

During the course of trial, the prosecution elicited evidence bearing on appellant's behavior towards the complainant's younger sister. In doing so, it relied upon one of the recognized exceptions—common scheme or plan—enumerated in *Drew v. United States*, 118 U.S.App.D.C. 11, 331 F.2d 85 (1964). On appeal, however, the government seems to shift its argument to the premise that the evidence was admissible because of appellant's disposition to commit an unusual sex offense. *See Dyson v. United States*, 97 A.2d 135 (D.C. 1953). Thus far, we have been careful to restrict this concept of admissibility to "other incidents" involving the same wrongdoer and same complaining witness. Moreover, in this instance, this theory of admissibility was never presented to the trial judge and thus the jury was never instructed on it. Accordingly, I cannot view the error as harmless.

ROGERS, Associate Judge, concurring:

I agree with the findings of error and that, of appellant's three primary assertions of error, one requires reversal. The erroneous admission of evidence offered by the prosecutor to show a common scheme or plan, that appellant had sexually molested the complainant's younger sister, substantially prejudiced appellant.

The trial court, and the government, relied on the common scheme or plan exception under *Drew v. United States*, 118 U.S. App.D.C. 11, 331 F.2d 85 (1964), for the admission of evidence relating to the complainant's sister. This exception is inapplicable in the absence of a showing that the incidents involving the sister had a definite and inextricable relationship to the incidents involving the complainant. *See Hackney v. United States*, 389 A.2d 1336, 1345 (D.C.1978) (coverup scheme), *cert. denied*, 439 U.S. 1132 (1979); *Davis v. United States*, 367 A.2d 1254, 1262–63 (D.C.1976) (offenses committed independently without unitary goal), *cert. denied*, 434 U.S. 847, 98

S.Ct. 154, 54 L.Ed.2d 114 (1977).[1] The government, by failing to argue before the trial court, as it does on appeal, that an alternative theory for the admission of the evidence was to show appellant's predisposition, denied appellant an opportunity to object,[2] and left the jury without proper instruction on the limited use of this evidence had the trial court admitted it on this alternative theory. Contrary to the limited common scheme or plan purpose for which the evidence was admitted, the prosecutor argued, moreover, that appellant was guilty of taking indecent liberties with the complainant because of what he had done not only to her but to her sister. Thus, the presumed prejudice from the erroneous admission of other crimes evidence, *Tinsley v. United States*, 368 A.2d 531, 533 (D.C. 1976), to which appellant had objected at trial, becomes manifest.

The same is not true, however, with regard to appellant's claims of error relating to a second affair and to subornation of perjury. First, with respect to the affair, the record reveals that the prosecutor lacked an adequate basis to inquire about the alleged Shirley Kumar affair. This became especially clear in the government's rebuttal case, following the denial by appellant's wife of any knowledge of the affair, Shirley Kumar's explanation of her relationship with appellant and his wife, and Mr. Kumar's secondhand information about the affair. In rebuttal, the government presented only the testimony of the complainant's mother that she had overheard appellant's girlfriend, Anita, ask Shirley Kumar if she was having an affair with appellant. Nevertheless, in view of appellant's admission of his affair with Anita and the nature of the evidence of the second affair, I do not view this to have been reversible error. In closing argument, the prosecutor did not state that appellant had had an affair with Kumar and the trial court instructed the jury that there was "no evidence at all" to support the prosecutor's question to appellant's wife (allegedly to show her bias) whether she knew about the second affair and that the testimony was to be "completely" disregarded.[3] *Smith v. United States*, 315 A.2d 163, 167 (D.C.1974) (jury presumed, absent record evidence to the contrary, to follow instructions).

The claim regarding the subornation of witnesses is more problematic simply because of the prejudice inherent in the allegation itself. The trial record reveals that the prosecutor's questions about appellant's two purported conversations with his witnesses were not based on an adequate factual predicate. Appellant did not object at trial to the questions about his conversation in the lunchroom. The government's witness, Detective McGinnis, was unable to testify that appellant had said anything to his witness other than "remember this." Faced with the denial of appellant's witness that the hallway incident[4] had occurred, and appellant's testimony that he was un-

---

**1.** Other jurisdictions have reached the same conclusion in factually similar circumstances. *See, e.g., Shockley v. States*, 585 S.W.2d 645, 652–54 (Tenn.Crim.App.1978); *People v. McMillan*, 86 Ill.App.3d 208, 41 Ill.Dec. 15, 407 N.E.2d 207 (1980); *People v. Martin*, 43 Colo.App. 44, 602 P.2d 873 (1979); *State v. Eubank*, 60 Ohio St.2d 183, 398 N.E.2d 567, 569 (1979).

**2.** Since *Drew, supra,* this court has not approved the introduction of evidence to show "intent and lustful disposition," as was done in *Dyson v. United States*, 97 A.2d 135, 137 (D.C.1953) (between different parties). *Cf. Miller v. United States*, 93 U.S.App.D.C. 76, 77, 207 F.2d 33, 34 (1953) (between same parties).

**3.** In denying appellant's motion for a new trial, however, the trial judge changed his view, stat-

ing it was not a question of no evidence but of the reliability of Mr. Kumar's secondhand information about his wife's affair. Nevertheless the trial judge found that although the testimony was improper, it had not affected the jury's verdict.

**4.** The prosecutor asked a defense witness, Robbie Paul, whether, while in the hallway outside of the courtroom, he had told another man that appellant had wanted him to say that he, Ali, had been at a particular party. Appellant's presence at this party was relevant to his ability to establish an alibi for one of the occasions on which the complainant claimed he had molested her.

able to remember going from table to table in the lunchroom, and the absence of government evidence other than an ambiguous remark, the prosecutor's comment in closing argument that appellant was "orchestrating witnesses" was without evidentiary support and constituted misconduct. However, appellant did not object to these remarks at trial.[5] The trial court gave the standard instructions on counsel's arguments and the jurors' recollection of the evidence. Viewing the comments in the context of the entire trial, *Fornah v. United States*, 460 A.2d 556, 560 (D.C.1983), and particularly in view of appellant's failure to object until appeal, *see* note 5 and accompanying text, *supra; Parks v. United States*, 451 A.2d 591, 613 (D.C.1983) (absence of defense objection some evidence that error not viewed as prejudicial), I am unpersuaded that plain error occurred. *See Watts v. United States*, 362 A.2d 706, 708 (D.C.1976) (en banc).

Accordingly, I join in reversing the conviction because the erroneous admission of other crimes evidence substantially prejudiced appellant and was not harmless.

---

**5.** Nor did he raise the issue in his motion for a new trial.