734 S.W.2d 837 (1987)
STATE of Missouri, Respondent,
v.
V---- C----, Appellant.
No. 14818.
Missouri Court of Appeals, Southern District, Division One.
June 8, 1987.
Motion for Rehearing, or in the Alternative, for Transfer Denied June 30, 1987.
Application to Transfer Denied September 15, 1987.
*838 Lew Kollias, Columbia, for appellant.
William L. Webster, Atty. Gen., Jatha B. Sadowski, Asst. Atty. Gen., Jefferson City, for respondent.
Motion for Rehearing, or in the Alternative, for Transfer to the Supreme Court Denied June 30, 1987.
CROW, Chief Judge.
A jury found V____ C____ ("defendant") guilty of committing sodomy, § 566.060, RSMo Cum.Supp.1984, upon his son, A____, and assessed punishment at 15 years' imprisonment. The trial court entered judgment per the verdict.
Defendant appeals, averring the trial court erred in (1) receiving in evidence the testimony of defendant's daughter, S____, wherein she narrated a "history of sexual and physical abuse" inflicted on her by defendant, (2) denying a request for mistrial when the prosecutor, on cross-examination, asked defendant whether he recalled saying he was afraid he was headed for jail, (3) striking a venireman for cause, and (4) giving MAI-CR 2d 2.20 [1984 Revision] defining reasonable doubt.
As the sufficiency of the evidence to support the verdict is unchallenged, we set forth only the evidence necessary to resolve the assignments of error.
*839 A____, the eldest of defendant's 13 children by his present wife, L____,[1] testified he (A____) was born November 5, 1966, and that on August 23, 1985, the date of the alleged crime, he and his siblings were residing with defendant and L____. Around 1:00 or 2:00 a.m., defendant, according to A____, entered A____'s bedroom, clad only in undershorts, and carrying "a real long knife." Defendant, age 55 at that time, stood six feet tall and weighed approximately 300 pounds. A____ testified defendant told him to take off all his clothes and lie on the bed. A____ quoted defendant as saying, "You cooperate with me or I will kill you." A____ obeyed defendant's command. A____'s testimony:
"Q. What happened ...?
A. He put his penis into my butt.
Q. All right. Now, do you know what sexual intercourse means?
A. Yes, I do.
Q. Is that what happened?
A. Yeah, that's what happened.
Q. How long did he have his penis in your butt?
A. Fifteen or twenty minutes.
Q. And what happened at the end of that time period?
A. In that time period, after he took it out, he made me suck his penis.
. . . .
Q. While thiswhile your father had his penis in you and while he had you suck him, did he say anything, did he make any comments?
A. He said don'tafter he got all done he said, `Don't say anything to nobody or I'll kill you.'
Q. While he was having sexual relations with you, where was the knife?
A. Above my head."
A____ recounted that defendant had come to his room about 1:00 a.m. the preceding date. A____'s testimony:
"Q. What happened on that occasion?
A. He had intercourse and oral sex.
Q. When you say intercourse, what are you saying?
A. My dad stuck his penis in my rearinto my butt.
Q. What did he say to you on this time?
A. This time he saidhe come up to my room and he told me to take all my clothes off and he said, `I'm going to have sex with you,' and he said, `I'll kill you if you don't cooperate.'
Q. Did he have anything else with him?
A. Yes, he had the knife with him.
Q. What sex did you have that day or that morning?
A. Oral sex and he stuck his penis into my butt."
Asked how frequently such episodes occurred, A____ replied, "All week, it happened all week." A____'s testimony:
"Q. Well, how often would it happen?
A. It happened once in the morning and once in the evening.
. . . .
Q. And basically, on each of those occasions, how would it occur and what would happen?
A. Everything would just happen the same, both oral sex and he put his penis in my butt.
Q. And why did you submit on those occasions?
A. Because I was scared of my dad, I was threatened."
A____ left home the last week in August, 1985, and began residing with a couple he knew through his church. Asked why, A____ explained, "Because I was tired of being sexually abused and child abuse." A____'s testimony:
"Q. Did [defendant] ever do anything to you physically, other than sex?
A. Yes, he took pictures of me naked, and had some guy come in and take pictures.

*840 Q. Let's go back. Do you recall when you first had any sex relations with your father?
A. Yes, I do.
Q. When was that?
A. That was when I was in the seventh grade.
. . . .
Q. Would you describe to the jury what happened on the first occasion?
A. First when he came up to my room, he had this knife, the first time I ever seen this knife, carrying it, and when he come upstairs he told me to take all my clothes off and had sex with me, where he stuck his penis into my butt.
. . . .
Q. Did he say anything to you during that?
A. He told mehe said, `Don't repeat this or I'll kill you, if I catch you saying anything to anybody.'
Q. When were the pictures taken?
A. They was taken while I was in the eighth or ninth grade.
Q. And when would your father take these pictures?
A. He would take them at night, some time at night, and sometimes during the daytime.
Q. When would he take them in relation to your sexhaving sex with him?
A. He'd take the pictures, then about an hour after that he'd come up and have sex.
Q. And he would have youwould he have you pose or
A. He would make me lie in bed and pose.
. . . .
Q. How did you know how to pose?
A. Well, he told me how to do it.
Q. How often would your father take these pictures?
A. Quite a bit.
Q. Did your father ever strike you or hit you?
A. Yes, sir.
Q. When would that occur?
A. Quite a bit, maybe once a week or almost twice a day, maybe."
A____ disclosed that he had left home on an occasion previous to August, 1985. On the former occasion, a social worker, Jessie Daniels, had arranged for him to reside with a schoolteacher and the latter's husband. A____'s testimony:
"Q. What did your father teach you about sex outside the family?
A. He said that it belongs inside the family and that's all.
Q. Did he ever say anything about what would happen to you if you had sex outside the family?
A. He would kill me, he said, `I'll go out and kill you.'
Q. Would your father have you pray at times?
A. Sometimes he let me pray.
Q. Did he ever have you pray about specific people?
A. Yes, sir.
Q. Who would that be?
A. Jessie Daniels or the people that was in the way, trying to help the family.
Q. What did he have you pray about Jessie Daniels?
A. Pray to have God strike her down and kill her."
A medical doctor specializing in gastroenterology examined A____ at the request of the prosecution. The doctor observed that A____ had a "lax anal sphincter," a condition consistent with A____'s allegations of rectal intercourse.
S____, called as a witness by the prosecution, explained that she was the next eldest child of defendant and L____, having been born December 20, 1968. Over the objection of defendantof which more later S____ testified she left home in May, 1985, because of physical and sexual abuse. Specifically, said S____, she had been beaten, thrown on the floor, thrown down stairs, and choked. Asked how defendant had struck her, S____ answered, "With his fists, or they'd use a belt on our backs and all over us." S____'s testimony continued:
"Q. Now, what type of sexual acts caused you to leave the home?
A. Having sexual intercourse.
Q. With whom?

*841 A. With my father.
Q. Do you recall the first time that happened to you?
A. Yeah, I was twelve.
Q. And do you remember where this occurred?
A. In his bedroom.
Q. Was anyone else present?
A. No.
Q. Do you remember how this happened?
. . . .
A. Well, he justhe just took me in his bedroom and he said that we were going to have some fun and stuff the first time he did it to me.
Q. Did he say anything else to you?
A. He just said I'd better do what he said.
Q. All right. Did he have anything else with him?
A. He had a knife.
Q. What kind of knife?
A. A pocket knife.
Q. All right. And was the blade in or out?
A. Out.
. . . .
Q. Did hewhat, if anything, did your father do with that knife?
A. He just held it up at my throat.
Q. Did he say anything to you while he held it up to your throat?
A. He just said I'd better do what he said.
Q. All right. And what happened then?
A. Then he would go and touch me and stuff.
Q. Where did he touch you?
A. Right up here on my breasts (indicating).
Q. All right. Did he touch you anywhere else?
A. Yes.
Q. Where?
A. On my privates.
Q. By your privates, what are you talking about?
A. I'm talking about down here between my legs (indicating).
. . . .
Q. What happened after he touched you?
A. Then he hadthen he had sexual intercourse with me.
. . . .
Q. Would you do the best you can to tell the jury what you mean?
A. By sticking his penis in my privates.
. . . .
Q. How long did that go on, S____?
A. Until I left home.
Q. I'm talking about on this particular occasion, how long did it
A. Oh, how long? About three times a week.
Q. Well, I'm talking about just on this specific night. How long did your father have sexual intercourse with you?
A. I don't know.
. . . .
Q. What, if anything, happened after your father was done having sexual intercourse with you?
. . . .
A. He just told me not to ever say anything to anybody, you know, that and after I left I went and took a shower and went upstairs to my bedroom.
Q. On this first occasion did he have you do any other sexual act?
A. Yes.
Q. What was that?
A. He made me suck his penis.
. . . .
Q. Did you ever have sexual acts with your father again?
A. Yes.
Q. When?
A. About three times a week.
Q. Until when?
A. Until I left home.
Q. And were they pretty similar to this first incident?
A. Yes.
Q. Was there always a knife present?
A. Not always, just every other time.

*842 Q. Would he everwhat would he say to you on these occasions?
A. He just told me I'd better do it or he'd kill me."
Later in S____'s testimony, we find this:
"Q. Was anything everwere any pictures ever taken of you?
A. Yes, he took nude pictures of me.
Q. All right. And when would he take these nude pictures?
A. He took them when no one else was around in the bedroom when I was twelve.
Q. Did he do it on the first occasion that you had sexual acts with him?
A. He did like a few days afterwards.
. . . .
Q. Do you recall what he said to you the first time he had you pose for one of these pictures?
A. He showed me a magazine and he just told me to pose and he said if I didn't do it he'd kill me and held the knife up that first time.
Q. And do you recall what kind of magazine he was showing you?
A. Playboy.
Q. Did you pose for him on that occasion?
A. Yes, I did.
Q. Were you wearing any clothes?
A. No, I wasn't.
Q. How often would he take these types of pictures?
A. He took them about twice a week.
. . . .
Q. Did your father ever have you say prayers?
A. Yes.
. . . .
Q. Would he ever have you pray about Jessie Daniels?
A. Yes, he hadpray that God would kill her.
Q. Did he say why?
A. No, he justhe said everything she's doing is wrong and everything, social services."
Defendant's evidence included testimony by himself and by L____. Defendant denied taking nude photographs of A____ and S____, denied having anyone else do so, and denied having sexual intercourse with A____ and S____. L____ testified none of the children ever complained about mistreatment or sexual abuse by defendant.
Defendant's first assignment of error asserts the trial court wrongly received S____'s testimony in evidence, in that such testimony revealed other crimes by defendant which were "not necessary to and did not logically show motive, intent or common scheme or plan to commit the crime for which the defendant was on trial, and introduction of this highly prejudicial and inflammatory evidence violated [defendant's] due process rights to a fair trial."
Defendant initially raised the issue by a motion in limine prior to trial, which was denied, and defendant preserved the point by appropriate objection at trial, and by including it in his timely, but unsuccessful, motion for a new trial.
Defendant, citing State v. Mitchell, 491 S.W.2d 292, 295[1] (Mo. banc 1973), and State v. Reese, 364 Mo. 1221, 274 S.W.2d 304, 307 (banc 1954), reminds us that proof of the commission of a crime other than the one with which the accused is charged is inadmissible unless such proof has some legitimate tendency to directly establish the accused's guilt of the charge for which he is on trial. Evidence of other crimes is competent to prove the crime charged when such evidence tends to establish motive, intent, absence of mistake or accident, a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other, or the identity of the person charged with the commission of the crime on trial. Mitchell, 491 S.W.2d at 295[1]; Reese, 274 S.W.2d at 307.
The State, acknowledging the above principles, insists that S____'s testimony was relevant to show a common scheme or plan by defendant to engage in continual sexual activity with his teenage offspring, to employ intimidation and physical abuse to compel them to submit, and to shroud his flagitiousness by warning them to tell no one and by teaching them that sexual activity *843 belongs inside the family. The State maintains that the crimes are so related to each other that proof of one tends to establish the other. S____'s testimony, says the State, coupled with A____'s testimony, establishes "what otherwise might seem an almost incredible story of sexual abuse over such an extended period of time."
In State v. Smith, 694 S.W.2d 901 (Mo. App.1985), the accused, an adult male licensed as a foster parent by the Division of Family Services, was convicted of engaging in deviate sexual intercourse with a 14-year-old boy entrusted to his care. The victim testified that the accused got in bed with him and masturbated him. The victim also testified that on two other occasions, the accused fondled the victim's testicles on the pretext of checking for disease. Another male youth, M, who had lived in the accused's home for one school semester, testified, over objection, that the accused would often get in bed with him, masturbate him, feel his privates, and engage in other intimate activity. On appeal, the accused argued that the trial court erred by receiving M's testimony, as it was proof of other crimes which had a prejudicial effect that far outweighed any probative value. Rejecting that contention, the opinion pointed out that the method used by the accused in his sexual contacts with the victim and M was identical. The place of the assaults was the same (in their beds), the time of the assaults was the same (early morning hours), the victims were similar (boys living in the accused's home), and the accused's actions were the same (lying next to the boys and masturbating them). M's testimony established a common scheme or plan by the accused to sexually molest young boys entrusted to his care. Id. at 902[2].
In State v. Koster, 684 S.W.2d 488 (Mo. App.1984), the accused and his wife were house parents at a juvenile detention facility. The accused was convicted of three counts of sexual assault on a 15-year-old female inmate. The trial court allowed three other teenage females to testify as to sexual advances made to them by the accused while they were inmates at the same facility. The admissibility of that testimony was upheld on appeal, the opinion stating that the circumstances indicated all of the sexual encounters resulted from a scheme or plan by the accused to exercise control and custody over his wards and to make them the target of his sexual excesses. All four girls were approximately the same age, all were inmates in detention and were under the supervision and control of the accused, the sexual encounters were initiated by the accused when the girls were alone with him at the detention center, the accused offered the girls special privileges, such as smoking, making long distance phone calls, or watching television after normal hours if they would engage in sexual activities with him, and there was consistent testimony that the accused threatened the girls with reprisals if they told anyone about the sexual activities. Id. at 490[3].
In the instant case, there were numerous similarities in the testimony of A____ and S____: (1) defendant used a knife to threaten them, (2) defendant said he would kill them if they refused to cooperate, (3) defendant compelled them to be photographed nude, and instructed them how to pose, (4) defendant told them to pray that God would kill Jessie Daniels, the social worker, (5) defendant's sexual activity with each of them began when they were approximately the same age, (6) defendant forced them to perform fellatio on him during the sexual encounters, (7) defendant threatened to kill them if they told anyone, and (8) defendant engaged in sexual activity with each of them on a regular and frequent basis. By reason of the respective ages of A____ and S____, it is evident from their testimony that there were several years when defendant used both, concurrently, as sex slaves.
A stronger case of a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other can scarcely be imagined. The linchpin in proving defendant's scheme to terrorize A____ and S____ into perpetual sexual activity with him is his statement to A____ that sex belongs inside the family, and that *844 he (defendant) would kill A____ if A____ "had sex outside the family."
That defendant's physical and sexual abuse of A____ and S____ constituted an ongoing scheme is best illustrated by the following testimony by S____:
"Q. Do you recall anything else that happened that your father did to you that day before you left home in May of 1985?
A. Sexual abuse, he said I was slacking off.
Q. Do you recall in particular what happened?
A. I just told himhe just started doing what he usually does and I told him I didn't want to do it no more, I was sick of it and everything.
Q. All right. You say he started doing what he usually did. Where was this at in the house?
A. In his bedroom.
Q. All right. Again, were you alone?
A. Yes.
. . . .
Q. All right. What did your father first say to you?
A. He just said that hethat we were going to do what we usually do.
Q. All right. Did he have anything with him?
A. He had a knife.
. . . .
Q. And did he ask you to take off your clothes or anything?
A. Yes, he told meyes, he did, he wanted me to do it and I wouldn't do it and I ran up the stairs.
. . . .
Q. All right. What happened, then, after you refused and left the room?
A. I got beaten severely.
Q. By whom?
A. By my father.
Q. And how did he go about hitting you?
A. With his fists and he kicked me in the kitchen and then I ran upstairs and he threw me all the way down the stairs and he tried to twist my neck.
Q. Was he saying anything to you during this time?
A. Started cussing me out.
. . . .
Q. And you left home later that night?
A. Yes, about 1:00 or 2:00 o'clock in the morning...."
Defendant, arguing that S____'s testimony was inadmissible, maintains that the controlling case is State v. McElroy, 518 S.W.2d 459 (Mo.App.1975). There, the accused was convicted of incest by engaging in fornication with his 14-year-old daughter. Over the accused's objection, the trial court allowed another daughter, P, to testify that during the time she was between 12 and 14 years old, the accused had, on several occasions, put his hands in her pants, played with her breasts, and threatened to "screw" her before she was 15. On appeal, P's testimony was held inadmissible, as it did not demonstrate that the accused's conduct with P "was of a continuous nature so as to be inseparable, in fact, from the crime charged," nor did P's testimony show that the offenses against her were "perpetrated concomitant with that against the prosecutrix." Id. at 461. The opinion noted that the State did not seek to justify the admission of P's testimony under any of the exceptions to the general rule excluding proof of the commission by the accused of another independent and unconnected crime. Id. at 462. Instead, the State asserted P's testimony was admissible as corroborative proof of the offense charged. Id.
We find McElroy too dissimilar to the instant case to be persuasive. In McElroy, there was no showing that the accused's fondling of P occurred near enough to the time of the crime charged to constitute part of a common scheme or plan, and, as noted above, the State in McElroy did not argue common scheme or plan as a basis for admissibility. McElroy, as we understand it, stands only for the proposition that in a prosecution for incest with a daughter, testimony of another daughter as to the accused's sexual advances toward her is inadmissible as corroborative proof of the offense *845 charged. McElroy, 518 S.W.2d at 462. We do not question that proposition. It simply does not apply to the instant case.
We hold that the admissibility of S____'s testimony in the instant case is established by Smith, 694 S.W.2d 901, and Koster, 684 S.W.2d 488. In so holding, we do not ignore defendant's ancillary contention that even if S____'s testimony regarding defendant's sexual crimes against her was relevant, her testimony about defendant's nonsexual assaults on her was irrelevant.
On that issue, we hold that the latter evidence was admissible to show the recurring violence by which defendant carried out his scheme of forcing A____ and S____ to submit to his sexual demands through intimidation and fear of physical harm. Such evidence demonstrated that defendant was physically capable of inflicting pain on A____ and S____, and that defendant did so with regularity, and apparently without compunction.
In rejecting defendant's first assignment of error, we have not overlooked Ali v. United States, 520 A.2d 306 (D.C.App. 1987), strongly relied on by defendant. Ali takes a narrow view of the common scheme or plan exception, contrary to Smith and Koster. We find the latter cases more persuasive. Defendant's first point is denied.
Defendant's second point concerns the following segment of his cross-examination by the prosecutor:
"Q. Now, I want to talk about the day that Bob Dixon and Larry Roark came to see you. I believe that was in September, was it not, September of '85, last September?
A. Yes, sir.
Q. Right after [A____] left the home?
A. Yes, sir.
Q. All right. Do you recall Bob Dixon and Larry Roark coming in to speak to you?
A. Yes, sir.
Q. All right. And do you recall making the comment to them, Mr. [C____], that you were afraid you were headed for jail?
A. No, sir.
Q. You don't remember that?
A. No, sir, I do not.
Q. You don't remember telling that to Bob Dixon and Larry Roark?
A. No, sir, I did not make no statement like that.
Q. All right. At the time that you went over".
At that juncture, defendant's lawyer requested, and was granted, a bench conference, during which he asserted that the statement mentioned by the prosecutor "has not been disclosed to the defense." Maintaining that the statement "comes as a surprise," defendant's lawyer asked for a mistrial.
The prosecutor conceded that the statement had not been disclosed. A discussion ensued between the trial court and counsel, during which the trial court allowed defendant's lawyer to move to strike. The latter did so. The trial court granted the motion to strike, but denied the motion for mistrial.
Proceedings then resumed in the presence of the jury, and the trial court instructed the jury to "disregard the last question and answer that was given to Mr. [C____] and answered by him."
Defendant avers that the denial of his motion for mistrial was reversible error. According to defendant, cross-examining him about the purported statement to Dixon and Roark rendered the trial fundamentally unfair, in that defendant denied any sexual contact with A____, the case turned on the issue of credibility, and the statement attributed to defendant evinced a consciousness of guilt that could have affected the jury's determination of credibility.
The State does not, in its brief, undertake to excuse the prosecutor's nondisclosure of the statement. Instead, the State argues that a trial court is not required to apply the drastic sanction of mistrial for every failure by a prosecutor to comply with discovery rules. The State asserts there was no showing in the instant case that the granting of defendant's motion to strike was inadequate to ensure a fair trial.
*846 We agree with defendant that the prosecutor was wrong in asking him about the undisclosed statement to Dixon and Roark. We point out, however, that defendant, in answering the question, denied making the statement.
Generally, when an improper question is asked but not answered, there is no prejudicial error. State v. Williams, 652 S.W.2d 102, 110[11] (Mo. banc 1983). It follows that if an improper question is asked and answered, and the answer is not harmful, there can likewise be no prejudicial error. Such was the result in State v. Crespo, 664 S.W.2d 548, 554[16] (Mo. App.1983), which held that any prejudice engendered by a question to the accused about an incriminating out-of-court statement was removed by the accused's denial that he made it. Identical circumstances exist in the instant case.
Furthermore, the trial court in the instant case, in instruction 2 (MAI-CR 2d 2.02), told the jury: "You must not assume as true any fact solely because included in or suggested by a question asked a witness. A question is not evidence, and may be considered only as it supplies meaning to the answer."
Finally, as reported earlier, the trial court granted defendant's motion to strike, and admonished the jury to disregard the question and answer.
The decision as to what remedy is called for when a prosecutor fails to comply with discovery rules lies within the sound discretion of the trial court. State v. Sykes, 628 S.W.2d 653, 656[8] (Mo.1982). Mistrial is a drastic remedy, to be granted only with the greatest caution and in extraordinary circumstances. State v. Lee, 654 S.W.2d 876, 879[4] (Mo. banc 1983). A motion for mistrial is addressed to the sound discretion of the trial judge, and the exercise of such discretion will be disturbed on appeal only when the record shows a manifest abuse. Id. at 879[3]. Where a prosecutor fails to comply with discovery rules, an abuse of discretion in refusing to impose the sanction of mistrial occurs only if there is a resultant fundamental unfairness to the accused. State v. White, 621 S.W.2d 287, 294[15] (Mo.1981).
In view of (a) defendant's denial that he made the statement to Dixon and Roark, (b) the admonition in instruction 2, quoted above, and (c) the trial court's directive to the jury to disregard the question and answer, we cannot convict the trial court of abusing its discretion in rejecting defendant's motion for mistrial. Defendant's second point is denied.
Defendant's third point complains that the trial court erred in granting a motion by the prosecutor to strike a venireman for cause. The point is governed by State v. Weekley, 621 S.W.2d 256 (Mo. 1981). There, as here, the accused complained because a venireman was excused from the jury panel, not because an allegedly unqualified venireman was retained on the panel. Weekley stated: "When the action complained of is the striking of a juror, an appellant is not entitled to relief unless he can show that the jury finally empaneled was not impartial." Id. at 258[2]. Accord: State v. Allison, 300 S.W. 1069, 1070[4] (Mo.1927).
Nothing in the record before us suggests, and defendant does not contend, that the jury which tried him was not composed of competent, qualified and unbiased jurors. His third point is, consequently, denied.
Defendant's final point alleges the trial court committed plain error in giving instruction 4, defining reasonable doubt.[2] *847 MAI-CR 2d 2.20 [1984 Revision], mandatory October 1, 1984; § 546.070(4), H.C.S.S.C. S.S.B. 276, Laws 1983, p. 923, effective October 1, 1984, S.C.S.S.B. 448, § A, Laws 1984, p. 757. The point is before us for plain error review only, as defendant failed to include the point in his motion for new trial. State v. Harris, 620 S.W.2d 349, 354[7] (Mo. banc 1981); State v. Mondaine, 655 S.W.2d 540, 544 (Mo.App.1983).
Defendant argues that defining proof beyond a reasonable doubt as "proof that leaves you firmly convinced of the defendant's guilt" diminishes the meaning of reasonable doubt, thereby constituting manifest injustice. Additionally, says defendant, the term "firmly convinced" establishes a lower standard of proof than "utmost certainty," a term appearing in In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368, 375 (1970).
Defendant's contentions are identical to those voiced by the accused and rejected by this Court in State v. Pendergrass, 726 S.W.2d 831 (Mo.App.1987). There, as here, the burden of proof instruction faithfully tracked MAI-CR 2d 2.20 [1984 Revision]. We cannot improve what was said in the majority opinion in Pendergrass, id. at 833-34, authored by Prewitt, P.J., or in the concurring opinion in Pendergrass, id. at 834-36, authored by Maus, J.
Applying Pendergrass, we hold that the trial court in the instant case committed no error, plain or otherwise, in giving instruction 4. Defendant's final point is denied, and the judgment is affirmed.
GREENE, P.J., and HOLSTEIN, J., concur.
NOTES
[1] Defendant acknowledged that L____ is his third wife. He sired two children by his second wife, none by his first.
[2] Instruction 4 provided, in pertinent part:

"The defendant is presumed to be innocent unless and until, during your deliberations upon your verdict, you find him guilty. This presumption of innocence places upon the state the burden of proving beyond a reasonable doubt that the defendant is guilty.
A reasonable doubt is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in the case.
Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. The law does not require proof that overcomes every possible doubt. If, after your consideration of all the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you will find him guilty. If you are not so convinced, you must give him the benefit of the doubt and find him not guilty."