Dwain MERCER, Appellant,

v.

UNITED STATES, Appellee.

Antonio M. Terrell, Appellant,

v.

United States, Appellee.

Nos. 97–CF–177, 97–CF–536.

District of Columbia Court of Appeals.

Argued Nov. 5, 1998.
Decided Jan. 28, 1999.

William F. Seals, appointed by this court, for appellant Dwain Mercer.

A. Kevin Fahey, Falls Church,VA, appointed by this court, for appellant Antonio M. Terrell.

Elizabeth C. Coombe, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher and Peter R. Zeidenberg, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL and RUIZ, Associate Judges, and NEWMAN, Senior Judge.

NEWMAN, Senior Judge:

In this appeal of their convictions of second-degree murder while armed, D.C.Code §§ 22–2401, –3202 (1997 Repl.), and related

weapons offenses,[1] both Dwain Mercer, a.k.a. "Wayne" or "Wayne–Wayne," and Antonio Terrell, a.k.a. "Melvin," contend the trial court erred: (1) in admitting evidence suggesting they were involved in a plot to intimidate witnesses; and (2) in admitting a videotape of a statement of a witness after the witness had been excused. Mercer alone contends that the trial court abused its discretion by denying his severance motion. Terrell alone contends: (1) a violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (2) ineffective assistance of counsel; and (3) evidentiary insufficiency. Concluding that the trial court abused its discretion in denying Mercer's motion for severance, we reverse his convictions. We affirm Terrell's convictions.

## I.

### A. FACTS

On June 1, 1995, Harvey Jewel and his brother sat outside of their house near the intersection of 46th and Hunt Streets, N.E., in a neighborhood known as Lincoln Heights. Suddenly, at about 7:00 p.m ., two men on a bicycle rode past the intersection and opened fire. The shooter, described as a light-skinned African American man with plaited hair, shot in the direction of Jewel, hitting his brother in the leg, and the beer can in Jewel's hand.

Earlier that day, Omar Johnson, a.k.a. "Yappy," a light-skinned African American man with plaited hair, was seen riding on the back of a bicycle on which his friend, Jason Brooks, was also riding. After the shooting, Jason Brooks was found shot to death in an alley near 46th and Hunt Streets. An abandoned bicycle was found not far from the body.

When Lynette Brooks heard of the death of her younger brother, Jason, she immediately went to the hospital to be with her mother, Geraldine Ferrell. Ms. Ferrell had been driven to the hospital by two of Jason's friends, Mercer and Terrell, who were visibly upset by Brooks' death. Both men acted out their anger by kicking and throwing trash cans, and kicking the walls. Mercer and Terrell left the hospital, and were seen in Terrell's blue Cadillac speeding past Ms. Brooks as she drove her mother home.

Meanwhile, Yappy went to the apartment of Robin Motley on Fiftieth Street in Northeast Washington, to have his plaits removed. While he was there, Terrell's blue Cadillac pulled up to a basketball court near Motley's apartment. As Mercer and Terrell got out of their car, they were greeted by Dominic Gibson. At Mercer's request, Gibson retrieved a gun from Yappy. Gibson then asked Yappy to go outside and speak with Mercer and Terrell.

Once Yappy was outside, Mercer and Terrell began to argue with him. During this argument, Mercer was overheard asking, "Well, how could he get shot and nothing happened to you," and "Why you leave him?" After these exchanges, several witnesses testified that they heard shots fired.

After this point, what happened was related in sometimes conflicting accounts. One witness, Catrice Cunningham, testified that she saw two men chase Yappy, shooting at him. Cunningham did not identify the shooters.

Another witness, Linda Washington, testified that she saw Mercer immediately after the shots were fired with a gun in his hand. Washington further testified that she saw a person get out of Terrell's car and shoot Yappy again.

Still another witness, Tamika Jones, testified before a grand jury that she saw Terrell pull out a gun and shoot Yappy. Jones claimed that she then saw Mercer and Terrell get back in the car. Jones further testified before the grand jury that she saw Mercer open the car door to knock Yappy down, and then stand over Yappy's body as he fired more shots into him. At trial, Jones recanted her grand jury testimony, claiming she had pieced together the story "like you put a puzzle together" in order to seek police protection.

---

**1.** Carrying a pistol without a license, D.C.Code § 22–3204(a), and possession of a firearm during a crime of violence, D.C.Code § 22–3204(b).

After the shooting, Terrell's car drove away. Terrell later stated to his grandmother, Elsie Terrell, that he burned his car so there would be no evidence.

## B. PROCEDURAL HISTORY

The trial began on Friday, November 15, 1996. One of the witnesses called on the first day of the trial was Catrice Cunningham. After the weekend, Terrell claimed that he was not satisfied with the manner in which his attorney had cross-examined Cunningham. Terrell requested a new attorney be appointed. The trial court denied the request.

During the trial, many witnesses failed to comply with subpoenas, necessitating the use of bench warrants to compel their testimony. During the examination of Dominic Gibson and Linda Washington, on the second day of the trial, the prosecution asked about some of the spectators in the back of the courtroom from Lincoln Heights, and the witnesses' reaction to their presence. Neither Mercer nor Terrell objected.

On the third day of the trial, Mercer's attorney moved for a mistrial, claiming he was prejudiced by the inference that his client was involved in a scheme to intimidate witnesses. The trial judge denied the motion. Mercer then requested a curative instruction, which was denied.

Later, the prosecution presented the testimony of Tamika Jones. At a bench conference, the prosecution addressed the issue of Jones' admission to the witness protection program. The prosecution represented that Jones had heard that her life had been threatened, and therefore sought police protection. As a result, Jones entered the witness protection program. Jones, however, left the witness protection program after eleven months. The prosecution wanted to introduce this evidence before the jury.

Initially, both Mercer and Terrell objected to the admission of this evidence. The attorney for Terrell, however, wanted to impeach Jones with the fact that she had been paid about $525 per week while in the witness protection program, in addition to having the government cover her housing expenses.

The attorney for Mercer did not want any evidence of the witness protection program admitted.

The trial judge informed both defense counsel that the fact that Jones entered the witness protection program due to fear would be admitted if either pursued the strategy of impeaching Jones over the money she was paid. The attorney for Mercer clearly stated that he would forego the impeachment value of such testimony to avoid any mention of the witness protection program. The attorney for Terrell, however, stated that he would risk the admission of the evidence of the alleged threat to Jones' life in order to impeach Jones. At this point, Mercer moved for a severance. The motion was denied.

Once on the witness stand, Jones recanted her grand jury testimony. The prosecution then proceeded to interrogate Jones further by reading transcripts of her grand jury testimony. It was revealed that before the grand jury, Jones adopted a statement she gave to police in 1995, claiming she had seen both Mercer and Terrell shoot Yappy. The substance of this statement was admitted during Jones' direct examination. Jones, however, claimed that she fabricated the story from bits and pieces that she heard from the street, in order to enter the witness protection program to protect herself and her son.

As Terrell's counsel cross-examined Jones, Jones continually denied that she was motivated to enter the witness protection program because of the money she was paid. Instead, Jones consistently stated that her motive was to protect herself and her son. Jones did reiterate, however, her claim that she lied to the police and the grand jury.

After Jones left the witness stand, the prosecution sought the admission of the videotape of the statement Jones initially gave to the police. The prosecution claimed the videotape was admissible both to impeach Jones, and to show the jury her demeanor when she made the statement. Both Mercer and Terrell objected, claiming they did not have an opportunity to cross-examine Jones on her demeanor in the videotape. The trial

judge overruled the objection, and admitted the videotape.

## II.

### A. STANDARD OF REVIEW

Appellants contend that the trial court erroneously failed to take remedial measures after the prosecutor asked a series of questions which implied that they had intimidated witnesses. First, however, we are faced with a threshold question that affects our standard of review. The government contends that neither Mercer nor Terrell objected to the allegedly prejudicial questions, thereby requiring this court to apply a "plain error" standard. Mercer and Terrell contend that the motion for a mistrial constituted a contemporaneous objection, as it put the trial judge on notice of their opposition to the evidence. They contend that this case should be reviewed under an abuse of discretion standard.

In our adversarial system, we place the initiative of objecting to evidence that appears to be contrary to the rules of evidence on the parties, not the judge. 1 McCORMICK ON EVIDENCE § 52, 200 (4th ed.1992). "If the administration of the exclusionary rules of evidence is to be fair and workable the judge must be informed promptly of contentions that evidence should be rejected, and the reasons therefor." *Id.* "The function of the objection is, first, to signify that there is an issue of law and, secondly, to give notice of the terms of the issue." 1 WIGMORE ON EVIDENCE § 18, 793 (Tillers rev.1983). Wigmore describes the proper timing of an objection:

> The general principle governing the time of the objection is that it must be made as soon as the applicability of it is known (or could reasonably have been known) to the opponent, unless some special reason makes a postponement desirable for him and not unfair to the proponent of the evidence. . . . For evidence contained in a specific question, the objection must ordinarily be made as soon as the question is stated and before the answer is given . . . .

*Id.* § 18, at 796–97.

■ Appellate courts have reviewed a trial court's decision on the admissibility of evidence under an abuse of discretion standard, even when it is not clear that the defendant made a contemporaneous objection, so long as the trial court ruled on the substance of the objection. *See, e.g., United States v. Palmer,* 3 F.3d 300, 304 (9th Cir. 1993), *cert. denied,* 510 U.S. 1138, 114 S.Ct. 1120, 127 L.Ed.2d 429 (1994) (ruling *in limine* sufficed when unclear if objection was renewed during trial); *Palmerin v. City of Riverside,* 794 F.2d 1409, 1413 (9th Cir.1986). An objection may be considered timely, even if not made at the moment a question is asked, so long as the objection gives the trial court an opportunity to instruct the jury properly, or consider a motion for a mistrial. *See, e.g., Jackson v. State,* 451 So.2d 458, 461 (Fla.1984), *cert. denied,* 488 U.S. 871, 109 S.Ct. 183, 102 L.Ed.2d 153 (1988); *Roban v. State,* 384 So.2d 683, 685 (Fla.Dist.Ct.App.), *review denied,* 392 So.2d 1378 (Fla.1980). To be considered timely, an objection must "permit the court to take appropriate and effective corrective action." *Coreas v. United States,* 565 A.2d 594, 600 (D.C.1989) (citations omitted); *see also Watts v. United States,* 362 A.2d 706, 708 (D.C.1976) (stating an objection must give the trial court an opportunity to correct any potential defect).

■ Once an evidentiary issue has been brought to the attention of the judge, under the continuing objection rule, counsel need not make the same objection when similar evidence is admitted later during the trial:

> The repetition of an objection is needless where the same or similar evidence, already duly objected to, is again offered; the prior objection suffices, if the court's ruling has indicated that an objection to such evidence will definitely be overruled.

1 WIGMORE, *supra,* § 18 at 815 (citations omitted). "An objection to evidence, once made and overruled, need not be renewed to the same type of evidence subsequently received." *Wilkins v. United States,* 582 A.2d 939, 942 n. 7 (D.C.1990). *See also McGrier v. United States,* 597 A.2d 36, 45 n. 14 (D.C. 1991).

Mercer and Terrell challenge the examinations of six witnesses. Defense counsel failed

to object to the questioning of the first three of these witnesses. Mercer's counsel only raised the evidentiary issues on the morning of the third day of the trial, moving for a mistrial, saying:

> But, in any event, he created in my mind the impression with the jury that there's witness intimidation here by pointing to the folks on that side of the audience. Those people there had no relevance to this trial, no relevance to her testimony. And I'm suggesting that that gesture, that colloquy, was entirely prejudicial to my client. And I went home and thought about it for awhile, and looked at some case law. That was an inappropriate comment to make in front of that jury, considering the atmosphere of this—here in the city today.
>
> And I believe that that is grounds for a mistrial, and I would move this Court for a mistrial at this point.

The judge denied the motion for a mistrial, but indicated her willingness to give a jury instruction.[2] Immediately after the trial judge denied the motion for a mistrial, counsel requested a curative instruction. The trial judge denied this request as well, despite her stated willingness.

■ We find that this motion for a mistrial preserved the evidentiary issues for appeal.

By virtue of Mercer's counsel's motion for a mistrial, and request for curative instruction, both of which were made while the prosecution was presenting its case in chief, the trial judge was given the opportunity to instruct the jury regarding the challenged questions. The judge declined to avail herself of that opportunity. Indeed, the trial judge ruled on the substance of the motions that had previously been made by both counsel and found that the evidence was admissible.[3] Because the judge did not overrule the motion on the basis of untimeliness, but actually ruled on their substance, and because the motion permitted the judge to take appropriate corrective action, we will review the evidentiary rulings on an objected to evidence standard of review.

■ Further, the motion served as a timely objection with regard to the final three witnesses brought to our attention. Mercer's counsel explicitly stated that he objected to questions pertaining to fear, as they implied that the defendants were in some way responsible for intimidating the witnesses. Because the judge made it clear that she did not think the questions were improper, counsel was under no obligation to renew the objection, as to do so would have proven futile. We therefore review the evidence admitted through all six challenged witnesses

---

2. The judge stated, "And I have instructed the jury, and I'll be happy to instruct them as often as you'd like, that nothing the lawyers say is evidence. It's only the witnesses [sic] testimony."

3. The trial judge stated:

> Well, the Court will deny the request for a mistrial. The Court did not note anything improper about the questions, and notes in particular that neither did either defense counsel at the time, there being no objection.

In spite of her awareness that no objection had previously been made, the judge did not deny the motion due to untimeliness. Indeed, the judge ruled on the substance of the motion:

> To the extent that counsel fears something improper about the context, because the words of the questions clearly were not improper, many things that happen in court legitimately can be argued in a variety of different ways, and there has certainly been—well, there's been no argument yet, and there's certainly been no improper argument, and certainly—I'm sure the Government would not, but I

would admonish the Government in advance not to improperly use the question and answers in closing argument in a way that suggests something that there is no evidentiary basis for.

> But, just the possibility out there that the information properly presented could be used in an improper way is not—when it's not promoted by the Government in that way is no basis—no reason for a mistrial. And I repeat that I do not recall that there was anything improper about the manner of the Government's asking the question.

> ✳ ✳ ✳ ✳ ✳ ✳

> And there was nothing in the questioning that suggested intimidation of the threatening sort, other than any witness testifying to a packed courtroom of neighborhood people, whether they be friends of the decedent or friends of the defendants is obviously going to be more nervous than a witness testifying to an empty courtroom. And there is nothing improper about questioning a [sic] obviously nervous witness about some of the factors that could reasonably cause a witness to be—to be uncomfortable.

on an objected to evidence standard of review.

## B. EVIDENCE OF ALLEGED WITNESS INTIMIDATION

Mercer and Terrell challenge the admission of certain evidence, claiming they were unfairly prejudiced. Both appellants claim that the prosecution created an improper inference that Mercer and Terrell were involved in a scheme to intimidate witnesses. The prosecution counters that the evidence was admissible to show the bias and motivation of various government witnesses.

 Generally, evidence showing the bias or motivation of a witness may be relevant in assessing the witness' credibility. *See Springer v. United States*, 388 A.2d 846, 855 (D.C.1978). That evidence may be relevant, however, does not end the trial court's analysis. *See Johns v. United States*, 434 A.2d 463, 473 (D.C.1981). The trial judge has the discretion to exclude relevant and otherwise admissible evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." *(William) Johnson v. United States*, 683 A.2d 1087, 1090 (D.C.1996) (en banc).

 " 'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." FED. R. EVID. 403 advisory committee's note. *See also Old Chief v. United States*, 519 U.S. 172, 180, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997); *United States v. Doe*, 284 U.S.App.D.C. 199, 204, 903 F.2d 16, 21 (1990). "Unfairness may be found in any form of evidence that may cause a jury to base its decision on something other than the established propositions in the case." 2 JACK B. WEINSTEIN AND MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 403 .04[1][b] (2d ed.1998).

Federal courts have found appeals to the passions of the jury, such as the presentation of evidence of threats against a witness, to have the potential for great prejudice against the defendant. *See, e.g., United States v. Thomas*, 86 F.3d 647, 653–54 (7th Cir.1996); *Dudley v. Duckworth*, 854 F.2d 967, 970–71 (7th Cir.1988), *cert. denied*, 490 U.S. 1011,

109 S.Ct. 1655, 104 L.Ed.2d 169 (1989); *United States v. Qamar*, 671 F.2d 732, 736 (2d Cir.1982). The court in *Thomas, supra*, 86 F.3d at 654, viewed the probative value of such evidence as limited, unless admitted to explain specific behavior of the witness, such as inconsistent statements, delay in testifying, or unusual courtroom demeanor. If the trial court admits evidence of threats solely to go to the general credibility or bias of the witness, such admission has been held to be an abuse of discretion. *See id.*

 Consistent with this view, we have stated that evidence concerning a witness' fear "tends to be prejudicial because it suggests the witness fears reprisal at the hands of the defendant or his associates if she testifies." *McClellan v. United States*, 706 A.2d 542, 551 (D.C.1997). Evidence concerning the fear of a witness, however, may be admissible where the witness has given conflicting statements. *Id.* at 551–52.

 Our case law instructs the trial court to be cautious in the admission of potentially inflammatory evidence. A prosecutor may not ask a question that is "totally groundless." *McGrier v. United States*, 597 A.2d 36, 44 (D.C.1991) (quoting *White v. United States*, 297 A.2d 766, 768 n. 1 (D.C.1972)). Rather, the prosecution must have a "well reasoned suspicion." *Id.* at 44–45 (quoting *United States v. Pugh*, 141 U.S.App.D.C. 68, 71, 436 F.2d 222, 225 (1970)). This court has admonished prosecutors for probing about an alleged attempt on the part of the defendant to suborn perjury through intimidation, a potentially inflammatory subject, based on little evidence:

> It is a generally accepted principle that the government may not attempt to manufacture evidence by creating an impression in the minds of the jurors through questions that imply the existence of facts.

*Ali v. United States*, 520 A.2d 306, 313 (D.C. 1987). *See also id.* at 315–16. *But see Carter v. United States*, 614 A.2d 913, 917–18 (D.C.1992) (holding that a question concerning a general threat from "the streets" and not a specific threat from the defendant was not improper).

■ Similarly, this court has admonished against engaging in tactics that promote the concept of "guilt by association." *See, e.g., Funchess v. United States*, 677 A.2d 1019, 1021 (D.C.1996) (citing 2 WAYNE R. LaFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 3.6(c), at 310 (3d ed.1996)) (stating that companionship with an offender alone is not enough to establish probable cause); *Irick v. United States*, 565 A.2d 26, 30 (D.C.1989) ("guilt by association is a very dangerous principle, and ... inferring culpability from an accused's blood relationship to a wrongdoer is fraught with peril") (footnote omitted); *Smith v. United States*, 558 A.2d 312, 315 (D.C.1989) (en banc) (stating reasonable, articulable suspicion cannot be based solely on guilt by association). The admission of evidence whose sole purpose is to connect a defendant to a group of people of questionable character and not relevant to some other factual issue is improper.

■ Determining whether the probative value of a piece of evidence is substantially outweighed by its unfair prejudice necessarily involves a balancing test. 2 WEINSTEIN, *supra*, § 403.02[2][a]. In so weighing the evidence, the trial judge should consider the availability of alternative methods or evidence that can prove the same proposition in a manner that is less unfairly prejudicial to the defendant. *Old Chief, supra*, 519 U.S. at 184, 117 S.Ct. 644. *See also Gross v. Black & Decker (U.S.), Inc.*, 695 F.2d 858, 863 (5th Cir.1983) (upholding the admission of potentially prejudicial evidence when no other alternative was available); 2 WEINSTEIN, *supra*, § 403.02[2][a].

■ In reviewing this determination of the trial judge, "we recognize that the evaluation and weighing of evidence for relevance and potential prejudice is quintessentially a discretionary function of the trial court, and we owe a great degree of deference to its decision." *(William) Johnson*, *supra*, 683 A.2d at 1095 (citations omitted).[4] A proper exercise of discretion involves a sufficient factual basis and substantial reasoning to support the trial court's decision. *(James W.) Johnson v. United States*, 398 A.2d 354, 364–65 (D.C.1979).[5] In reviewing a trial court's decision for an abuse of discretion, the appellate court should consider the context in which that decision was made. *Id.* at 366.

Having discussed the applicable legal principles, we now turn to the facts of this case. Mercer and Terrell challenge the prosecution's questioning of six witnesses. We will examine each challenged witness in turn to assess the propriety of the evidence admitted.

## 1. CATRICE CUNNINGHAM

The prosecution presented the testimony of Catrice Cunningham, an eyewitness to the crime. Cunningham looked out of her window on June 1, 1995 to see two people having a conversation near a dark blue car that she knew belonged to Melvin Terrell. She saw two men chase Yappy, shooting at him. While she did not directly identify the shooters, Cunningham did state that Melvin Terrell was at the scene.

The attorney for Terrell then impeached Cunningham with a statement she gave to a defense investigator.[6] In that statement, she did not say anything about an argument or a blue car. Nor did Cunningham state that Melvin Terrell was at the scene.

---

4. That this appellate court owes a great degree of deference to the trial court in this matter is in accord with the Federal courts addressing the exercise of discretion under FED. R. EVID. 403. *See, e.g., United States v. Fawley*, 137 F.3d 458, 466 (7th Cir.1998); *United States v. Rezaq*, 328 U.S.App.D.C. 297, 313, 134 F.3d 1121, 1137 (1998); *United States v. Pitrone*, 115 F.3d 1, 8 (1st Cir.1997); *United States v. Moore*, 917 F.2d 215, 233 (6th Cir.1990); *United States v. Long*, 574 F.2d 761, 767 (3d Cir.), *cert. denied*, 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978). "The trial judge, not the appellate judge, is in the best position to assess the extent of the prejudice caused a party by a piece of evidence." *Long, supra*, 574 F.2d at 767.

5. A factual basis does not necessarily mean that the trial court must hold a factual inquiry. The record of the proceedings, or an attorney's offer of proof may serve as an adequate foundation. *(James W.) Johnson, supra*, 398 A.2d at 364.

6. The record does not indicate which defendant, Mercer or Terrell, hired the defense investigator.

On redirect, the prosecution asked Cunningham about the circumstances surrounding the statement given to the defense investigator:

Q: Ms. Cunningham, can you tell the ladies and gentlemen of the jury what the circumstances were when you were visited by this defense investigator?

A: When I was visited, when he came to see me to take that statement, Melvin's girlfriend was with him and I told [the prosecuting attorney] that I gave him—I didn't give him quite the exact information that I gave [the prosecuting attorney], but I gave him part of what I knew. It's been three years ago. I mean what is—how am I supposed to—

Q: Ms. Cunningham, you started off when I asked you the circumstances of your giving that statement, the first thing you said was that the investigator was accompanied by Melvin's girlfriend?

A: Yes.

Q: That would be Melvin Terrell's girlfriend?

A: Yes.

Q: How did that make you feel when you saw Melvin Terrell's girlfriend?

A: · It scared me.

Q: Was what you told the defense investigator about the, about there not being a blue car the truth?

A: No.

Q: Why did you tell the defense investigator you didn't see Melvin Terrell and you didn't see the blue car?

A: Because I was scared. That's why I didn't tell him.

Q: Were you afraid that it was going to get back to Melvin Terrell?

A: I know—of course, I know it was going to get back to him.

Q: Ms. Cunningham, why are you here today?

A: Because I was subpoenaed to be here today.

Q: Do you want to be here?

A: No.

Q: Are you happy about testifying in this case?

A: No. Because I could leave here today and y'all might never see me again.

 Under these circumstances, the evidence initially elicited from Cunningham on redirect was properly admitted. Cunningham had been impeached by a prior inconsistent statement. The prosecution sought to rehabilitate the witness by having her explain the facts and circumstances that surrounded the prior inconsistent statement. The jury could infer that the presence of Terrell's girlfriend influenced Cunningham to give the investigator a statement favorable to Terrell.

The statement that Cunningham might never be seen again, however, was not appropriate to rehabilitate the witness. The prosecution had already given Cunningham the opportunity to explain her inconsistent statement. Cunningham provided an adequate explanation. Further, the statement was not necessary to establish Cunningham's motivation in testifying, or her reluctance. The prosecution had already established that Cunningham only testified because of a subpoena, and that she did not want to be in the courtroom. Having elicited this evidence, the prosecution should have then stopped its redirect examination.

The statement was prejudicial, as it implied that Cunningham had received some type of threat regarding her testimony. This type of evidence could very well have aroused the passions of the jury, and suggested a conviction based on their aversion. Additionally, the prosecution did not appear to have any evidence to form a well reasoned suspicion that Cunningham had received a threat, or if such threat had occurred, that it came from either Mercer or Terrell. Although it did not appear as though the questioning specifically sought a statement from Cunningham concerning an alleged threat, nonetheless, due to the danger of unfair prejudice, this statement should have been stricken from the record on proper objection or motion and the jury properly instructed.

## 2. DOMINIC GIBSON

The prosecution attempted to show that Dominic Gibson first retrieved a gun from

Yappy and gave it to Mercer, and then told Yappy to go outside to speak with Mercer and Terrell. Once on the stand, the witness did not cooperate. Gibson first testified that he stayed in the apartment of Robin Motley, having his hair done, during the entire incident. The prosecution proceeded to interrogate Gibson by use of his grand jury testimony.

At the end of Gibson's direct examination, the prosecution asked Gibson about spectators attending the trial:

Q: And do you know these people seated in the back row of the room today?

A: Yeah, I know them.

Q: Are they friends of yours?

A: They all right.

Q: Are they friends of Melvin's and Wayne–Wayne's?

A: I don't know. That's them. I don't know who friends with them or not. I don't know. I can't vouch for both of them.

Q: Are they friends of yours from Lincoln Heights?

A: Who?

Q: The people seated in the back of the courtroom?

A: Yeah, they are. They from Lincoln Heights.

Q: They're from Lincoln Heights? Why are you here testifying today?

A: Why am I here testifying?

Q: Yeah. Why are you here testifying? Are you here voluntarily?

A: Yeah. Y'all keep coming locking me up, picking me up, that's why I'm here.

Q: You were subpoenaed, weren't you?

A: Right.

Q: And you didn't show up the first time, did you?

A: Yeah, I was here. You saw me. You looked at me.

Q: Do you want to be here today?

A: Yeah, I want to be here today. I'm right here.

Q: Do you want to be testifying against Melvin and Wayne–Wayne?

A: I ain't—you asking me questions. I'm giving you answers.

▇ It is clear that Mr. Gibson contradicted his grand jury testimony. As Gibson was confronted with this grand jury testimony, it would be proper to inquire into the reasons why Mr. Gibson was changing his testimony. As in the case of Cunningham, moreover, it was not improper to elicit that Gibson was an unwilling witness. The manner in which the prosecution proceeded, however, was improper.

In this instance, the prosecution attempted to link the people in the back of the courtroom to the defendants, Mercer and Terrell. By highlighting that the spectators were from Lincoln Heights, and intimating that they were friends with Mercer and Terrell, the prosecution created an impression that the spectators were there to influence the testimony of the witnesses. Such tactics are fraught with the potential for unfair prejudice for two reasons. First, they suggest to the jury a decision based on "guilt by association." That is, the evidence suggests that because these imposing figures in the back of the courtroom were somehow connected to Mercer and Terrell, Mercer and Terrell must need their presence to intimidate witnesses because they are guilty. *See United States v. Irvin,* 87 F.3d 860, 866 (7th Cir.1996) (stating evidence of gang membership could have a prejudicial effect by increasing the chance of a conviction based on guilt by association). Second, the evidence plays on the passions and fear of the jury, by suggesting that a threat exists against the witnesses. *See McClellan, supra,* 706 A.2d at 551.

That the prosecution did not mention the words "intimidation" or "threat" is immaterial in this context. The impression that the spectators from Lincoln Heights were present to influence witnesses was still created. By linking the fact that Gibson had testified at trial in contradiction to his grand jury testimony with the presence of spectators from Lincoln Heights, the prosecution inescapably implied that the spectators were there to intimidate witnesses.

Further, the purpose for which the reference to the spectators from Lincoln Heights was made could have been accomplished by

an alternative method, less prejudicial to Mercer and Terrell. The prosecution claims that this evidence was relevant to give the jury a glimpse into the state of mind of Gibson. This could have been accomplished without reference to the spectators from Lincoln Heights. The prosecution could have established that Gibson was only testifying due to a subpoena, and that Gibson did not want to be in the courtroom. Given the potential for unfair prejudice, and the availability of an alternative, less prejudicial method to accomplish the same goal, the suggestion that Gibson's recantation of his grand jury testimony was the product of fear was improper.

*Carter v. United States*, 614 A.2d 913 (D.C. 1992), is not to the contrary. There, the prosecution asked whether the witness realized that he could face consequences on the street for his testimony. The court found the questions referred to a general threat, and did not directly implicate the defendant. *Id.* at 918. Thus, we held that the questions did not require reversal. *Id.* at 919. The reference to the people from Lincoln Heights in the back of the courtroom in this case, however, was not a reference to a general, abstract threat. By highlighting their presence, the prosecution created the impression of a very real and immediate threat. Additionally, it gave the jury a face with which to associate that threat. Further, by attempting to link the spectators from Lincoln Heights to Mercer and Terrell, the prosecution implied that there was a threat coming from the defendants. Thus, unlike the reference in *Carter*, the line of questioning in this case did have the potential to create direct, unfair prejudice against Mercer and Terrell.

### 3. LINDA WASHINGTON

The prosecution presented the testimony of Linda Washington, a resident of Lincoln Heights, to establish several key facts to this case. Initially, the prosecution showed that Ms. Washington did not want to be in the courtroom, and was testifying only because of a subpoena. Washington then testified that on June 1, 1995, while walking on Fiftieth Street, she saw Mercer and Terrell speaking with Yappy near Terrell's blue car.

Washington then heard gunshots. While Washington did not see the actual shooting, she did see Mercer with a gun in his hands immediately after hearing the shots. Washington then testified that she saw Terrell get into his car. Next, a person whom Washington did not identify, got out of the car and shot Yappy again. Washington saw the car drive away, with Terrell driving. Washington's trial testimony was *consistent* with her grand jury testimony in all relevant respects.

The prosecution ended the direct examination by inquiring about Washington's feelings on testifying:

Q: Do you still live in Lincoln Heights,—

A: Yes.

Q: —Ms. Washington?

A: Yes.

Q: Do you recognize anyone from Lincoln Heights in the courtroom? I'm not asking you to point them out, but sitting in the courtroom. Do you recognize people from Lincoln Heights?

A: Yes.

Q: And how do you feel about having to testify here today?

A: I don't feel right. I don't want to be here.

 As stated above, the references to spectators from Lincoln Heights created a danger of unfair prejudice by suggesting that the spectators were in the courtroom in an attempt to intimidate witnesses. Here, unlike Mr. Gibson, Ms. Washington did not contradict her grand jury testimony. Thus, there was no inconsistent statement that needed explanation. References to the spectators from Lincoln Heights could only have served to explain Washington's credibility or potential bias in a general sense.

Further, the prosecution had established Washington's state of mind early in the direct examination. The prosecution began its questioning of Washington by showing that she did not want to be in the courtroom, and that she was only testifying due to a subpoena. Thus, the prosecution availed itself of an alternative, less prejudicial method of showing the state of mind of the witness. Questions concerning the presence of people from

Lincoln Heights in the back of the courtroom were improper, and should have been excluded.

## 4. LYNETTE BROOKS

 The prosecution opened its questioning of Lynette Brooks by eliciting the fact that Ms. Brooks had been arrested that morning for her failure to appear in court while under subpoena. Ms. Brooks claimed that she did not appear because she could not find a baby-sitter. Ms. Brooks admitted, however, that she was hiding under a pile of laundry when the marshals arrived at her house to arrest her. The prosecution then established that Mercer had fathered a child with Ms. Brooks. Further, Ms. Brooks testified that Jason Brooks, the man who had accompanied Yappy earlier in the day on June 1, 1995, and was later found shot to death, was her younger brother.

Here, despite the claim that this line of questioning intimated a scheme to intimidate witnesses, the questions were proper. From the record, it is apparent that the prosecution had been experiencing difficulty with its witnesses. In fact, several bench warrants were issued when witnesses ignored subpoenas. Ms. Brooks was one witness who was arrested for ignoring a subpoena.

The fact that Ms. Brooks had to be arrested was relevant, as it showed her motivation not to testify. The fact that she and Mercer had an intimate relationship that produced a child was relevant, as it tended to show bias. Thus, the questioning only tended to show that Ms. Brooks did not want to testify against a man with whom she had a prior romantic relationship. Such testimony is relevant, and does not intimate a scheme to intimidate witnesses, as Mercer and Terrell argue.

7. Being of such a view, the trial judge more properly should have sustained the objection at this time. If it later became appropriate to explain "inconsistencies," the court then could permit these questions at that time.

8. Super. Ct. R.Crim. P. 15(a) provides:
Whenever due to exceptional circumstances of the case it is in the interest of justice that the

## 5. NATASHA STRINGFELLOW

The prosecution began its questioning of Natasha Stringfellow asking why she was in court that day. Stringfellow replied that she was under subpoena, and that she had not complied with the subpoena because she was scared:

Q: Why didn't you turn up for court?

A: I was scared.

Q: Do you want to be here today?

A: Sure don't. No.

Q: Why was it you eventually came in voluntarily?

A: Because the people said they was going to take my kids, and I came down here.

Q: I'm sorry.

A: They said they was going to take my kids.

Counsel for Terrell objected, stating that the witness' state of mind had not yet been put into issue. Mercer's counsel joined in the objection. The trial judge stated that she was not going to rule on the objection until after the witness had testified, to see if demeanor had become an issue.[7]

Stringfellow testified that she was a friend of both Mercer and Terrell. On June 1, 1995, she was on her way to the house of Jason Brooks after she learned that he had been killed. At that time, she heard Mercer and Yappy arguing. Terrell's car was on the scene. Stringfellow then heard shots.

The record indicates that Stringfellow had trouble recalling her prior deposition[8] testimony:

Q: Okay. Now, Ms. Stringfellow, what do you remember? What else do you remember?

A: I don't remember nothing that paper said he said. I don't remember nothing.

Q: Do you remember testifying?

A: Yeah.

testimony of a prospective witness of a party to be taken and preserved for use at trial, the Court may upon motion of such party and notice to the parties order that testimony of such witness be taken by deposition and that any designated books, papers, documents, record, recording, or other material not privileged, be produced at the same time and place.

Q: Under oath?

A: Yeah, I remember talking to the lady.

\* \* \* \* \* \*

Q: You remember what Wayne–Wayne said—

A: I don't remember. I don't remember.

Q: Let me ask you. "Well, how could he get shot and nothing happened to you?"

A: I don't remember.

Q: "You got away, and you get to come home and tell everything that happened, and nothing happened to—I mean, he got shot, and you're okay, and you're walking around like nothing—like there ain't nothing wrong."

Do you remember testifying to that?

A: I don't remember.

At the end of Stringfellow's testimony, both defense counsel renewed their objection, fearing the opening portion of the examination was prejudicial to their clients. The court gave a limiting instruction:

All right, Ladies and gentlemen, I want to again instruct you that you recall Ms. Stringfellow began her testimony by saying that she had been—had not wanted to be here and that she was scared.

I want to emphasize to you, so that you not misuse that type of evidence from this witness, there is absolutely no evidence in this case that either defendant on trial has had anything to do with any conduct that would have any basis for a comment like that from a witness of being scared.

There are dozens of reasons why any witness may be concerned that have nothing to do with a particular defendant on trial, and you are not to speculate about what the cause may be, because that's not in

evidence. But, I affirmatively instruct you that there is absolutely no evidence that either of these defendants is the cause.

And, again, the only reason that kind of testimony is permitted is to help you understand the state of mind of witness at the time of testifying. So, use it for that purpose only, and do not use it against either defendant.

■ Other than on the issue of "timing," we find no error in the trial judge's action. First, the witness demonstrated a lack of memory of her prior testimony. Questions about her state of mind, therefore, become relevant to explain the inability to remember.[9] This evidence was meant to explain specific behavior of the witness while testifying; it did not go only to her general credibility, as in the case of Washington.

Second, the trial judge instructed the jury on the proper use of this evidence. After an objection by the defense counsel, the judge gave a limiting instruction. This instruction informed the jury that the only reason for the evidence was to place the testimony of the witness in the proper light, and allow them to assess her state of mind and demeanor.

Third, the challenged portion of Stringfellow's testimony does not appear to implicate either Mercer or Terrell. Stringfellow commented that "they was going to take my kids" in response to a question as to why she *did* testify, not to explain her reluctance to testify. The statement appears to show that Stringfellow perceived there to be a threat by some government agent that if she did not testify, the government would take her children into custody.[10] While not completely

9. During a bench conference, the trial judge found that Stringfellow's demeanor became an issue in determining her credibility:

It is obvious from her manner of testifying, as well as her actual words, that she was scared, that she—and indeed more for cross examination even then for direct. She started saying she didn't remember even before the question was out. It was clearly not a—I'll let the jury draw their own conclusions, but this Court believes it was not a legitimate failure of recall.... It was a decision on her part not to remember. And she was quick to say it, even before she knew what the question was. She

obviously had decided that she was going to declare she didn't remember a thing.

The jury has a right to some explanation for that kind of behavior on the witness stand. The defendants also have an absolute right not to be prejudiced by, you know, a finger being pointed at them as the cause. And nothing the Government asked the witness and indeed nothing the witness said indeed suggests that either defendant had anything to do with it.

10. The record discloses no other evidence that such a threat was ever made. Indeed, the response of the prosecutor shows that he was taken

clear, a reasonable reading of this testimony is that she only complied with the subpoena and appeared in court to avoid having the government follow through on this threat.

Except as noted previously in footnote 7, the conduct of the trial judge was proper as to this witness. The evidence did tend to explain Stringfellow's demeanor, and the judge did give a proper limiting instruction.

### 6. TAMIKA JONES

Mercer and Terrell challenge the admission of evidence showing that Tamika Jones entered the witness protection program due to an alleged threat on her life.[11] The prosecution claims this evidence was admissible on two separate grounds. First, the prosecution claims the evidence is admissible on an independent basis as relating to Jones' credibility. Second, the prosecution claims the evidence was admissible, anticipatorily, under the doctrine of curative admissibility.

With respect to the prosecution's first argument that the evidence was independently admissible, even where this evidence is relevant, as previously noted, the evidence would still be subject to exclusion if its probative value were substantially outweighed by the danger of unfair prejudice. *See (William) Johnson, supra*, 683 A.2d at 1090.

Jones' state of mind became an issue due to her conflicting accounts. First, Jones told police that she did not see anything. At this time, she was not in the witness protection program. Then, Jones approached the police and gave a detailed description of Yappy's murder. Jones told the police that she saw Terrell shoot Yappy. Mercer and Terrell then got into Terrell's car. Mercer opened his door to knock down Yappy. Then, Mercer stood over Yappy's body and shot him again. Jones repeated this version of events before the grand jury.

At trial, Jones recanted her grand jury testimony, testifying that she did not see the actual shooting. Jones claimed that she fabricated the story she told to the grand jury in order to enter the witness protection program. Jones left the witness protection program before trial began. Due to the fact that Jones gave three different accounts of Yappy's murder, evidence of her state of mind became relevant to assess her credibility.

 The danger of unfair prejudice with respect to Jones' reasons for entering the witness protection program, however, is clear. Jones testified that she received a threat. As stated above, this type of testimony has the danger of appealing to the emotions of the jury by implying—without

---

by surprise by this accusation. We have no way of knowing whether this accusation was true.

11. Tamika Jones testified as follows:

> Q: Now, Ms. Jones, were you a witness to a murder that took place on June 1, 1995, when Yappy got killed?
> A: I was out there.
> Q: And did you see the murder?
> A: Yeah, I saw it.
> Q: And sometime after the murder, were you questioned by the police?
> A: Yes.
> Q: And did you tell the police that you saw what happened?
> A: Yep.
> Q: When the police first talked to you, did you tell them you saw who did it or not?
> A: Yeah, I told them I saw who did it.
> Q: Do you remember telling them that you didn't see anything, that you just heard shots?
> A: Yeah, I told them—yeah, the first time, I told them I didn't see anything, because I didn't want to get in it.
> Q: You didn't want to get in what?

> A: Involved in this, this case.
> Q: Now, what did you say—in an effort to stay out of it, not get in it, as you say, what did you say to the police?
> A: I told them I ain't see nothing.
> Q: Was that true?
> A: Somewhat.
> Q: But, you did see it, didn't you?
> A: Did I?
> Q: Yeah.
> A: I saw, you know, the people outside, but what I—what I said on the video testimony?
> Q: Yeah.
> A: I said all that because I was scared and everything. And the way the police was questioning me, like you put a puzzle together, and you hear information from people to people, I put all that together. But, I was out there when all of them was outside, though.
>
> * * * * * *
>
> Q: At some point, Ms. Jones, and I'm not going to ask you what you heard, okay, but at some point did you hear something that made you feel that you'd been threatened?
> A: Yeah.

evidence—that a defendant made the threat, thereby creating the danger of unfair prejudice. While Jones did recant her grand jury testimony at trial, the prosecution could have explained this in a less prejudicial manner by showing that she testified before the grand jury while she was in the witness protection program, and that she had left the witness protection program before testifying at trial. This alternative approach would have minimized the potential prejudice involved in disclosing the alleged threat, coupled with an appropriate limiting instruction.

■ The prosecution next argues that the evidence was admissible, anticipatorily, under the doctrine of curative admissibility. This doctrine provides that in certain circumstances the prosecution may inquire into evidence otherwise inadmissible, but only after the defense has "opened the door" with regard to this evidence. *United States v. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); *Jenkins v. United States*, 374 A.2d 581, 585–86 (D.C.1977) (citing 1 J. WIGMORE ON EVIDENCE § 15 (3d ed.1940)). We note that "[t]he doctrine of curative admissibility is one dangerously prone to overuse." *United States v. McClain*, 142 U.S.App.D.C. 213, 216, 440 F.2d 241, 244 (1971). The United States Court of Appeals for the District of Columbia Circuit stated that the doctrine should not be used unfairly to prejudice the defendant:

> The doctrine is to prevent prejudice and is not to be subverted into a rule for injection of prejudice. Introduction of otherwise inadmissible evidence under shield of this doctrine is permitted "only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence."

*United States v. Winston*, 145 U.S.App.D.C. 67, 71, 447 F.2d 1236, 1240 (1971) (quoting *California Ins. Co. v. Allen*, 235 F.2d 178, 180 (5th Cir.1956)). The Court of Appeals in *Winston* quoted the trial judge (Judge William B. Bryant) with approval:

> This business about "opening the door" is a much overused issue and it carries with it an oversimplification. Opening the door is one thing. But what comes through the

door is another. Everything cannot come through the door.

*Id. See also Jenkins, supra*, 374 A.2d at 585–86.

The government further relies on the principle that, under the proper circumstances, the prosecution may anticipate an attack on the credibility of its own witness and disclose facts relating to that witness' credibility on direct examination. *See, e.g., Reed v. United States*, 452 A.2d 1173, 1179 (D.C.1982), *cert. denied*, 464 U.S. 839, 104 S.Ct. 132, 78 L.Ed.2d 127 (1983); *United States v. Mobile Materials, Inc.*, 881 F.2d 866, 875–76 (10th Cir.1989); *United States v. Koppers Co.*, 652 F.2d 290, 299 (2d Cir.), *cert. denied*, 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 617 (1981); *United States v. Hasenstab*, 575 F.2d 1035, 1040 (2d Cir.), *cert. denied*, 439 U.S. 827, 99 S.Ct. 100, 58 L.Ed.2d 120 (1978). There is, however, always a danger in permitting a party to "defang" prejudicial evidence on direct examination where the admissibility of the evidence depends upon the "curative admissibility" rationale. This is so because it is often difficult at best to anticipate what will be done on cross-examination to "open the door" and the extent to which, if any, "curative admissibility" is appropriate. That becomes evident when we consider the facts of this case.

Before presenting the witness, the prosecution discussed potential problems concerning Tamika Jones at a bench conference, out of the presence of the jury. The prosecution informed the court of its understanding that Jones only came forward because of a threat made by Mercer. The court gave the prosecution permission to ask about the threat, without giving the specifics of who may have given the threat. The prosecution wanted to leave the specifics of the threat to the defense attorneys, if they so chose. "Defense counsel wants to explore it with her, they can do so, but I don't want—I don't want any missteps regarding that."

At this point, the two defense counsel chose different strategies. The attorney for Mercer did not want to question Jones at all about her entry into the witness protection program. Mercer's attorney stated, "Your Honor, I think we would—we would waive

the value of impeachment testimony if we could avoid talking about the witness protection program as well as the threat to her in this case."

The attorney for Terrell, however, wanted to question Jones about her reasons for entering the witness protection program. Specifically, Terrell's attorney wanted to establish that her reason for entering the witness protection program was to get paid by the government. The judge made it clear to Terrell's attorney that if he wanted to attempt to show that Jones was motivated by money, the prosecution would be allowed to show that her motivation was actually fear. To this, Terrell's attorney responded, "I'm prepared to take—to deal with the risk involved in the witness saying that she received a threat, in order to get the benefit that the—that she's on the Government payroll or however it is I choose to characterize this." [12] Mercer then moved to sever his case from that of Terrell, but the motion was denied.

■ Given this bench conference, our analysis of the propriety of the admission of this evidence becomes bifurcated. Terrell's attorney made it clear that he was prepared to accept the risk of the potential prejudice in order to impeach Jones concerning her entry into the witness protection program. Had Terrell done so, the prosecution could have rehabilitated Jones on redirect by presenting the evidence of the alleged threat in the manner prescribed by the trial judge. Thus, with respect to Terrell, while the wiser course would have been to await actual cross-examination before ruling on the "curative admissibility," we cannot say the trial court erred in permitting the prosecution to anticipate this challenge to Jones' credibility, and thereby disclose Jones' claimed true reason for entering the witness protection program on direct examination.

The situation is different as to Mercer. Mercer's attorney emphatically argued that he did not want to create the possibility that the jury would use this evidence in an unfairly prejudicial manner against his client. Mercer's attorney, therefore, was willing to forego the opportunity of impeachment for what he perceived to be the greater benefit of avoiding the potential for unfair prejudice. If means lay at hand for accommodating that wish while respecting Terrell's strategy as well, the trial court was obligated to seriously consider them, which brings us to Mercer's motion for severance.

## C. SEVERANCE

When the court ruled that the government could inquire into these matters on direct examination, Mercer sought a severance. His concerns were very real as the government had proffered that the threats emanated from Mercer.

■ Generally, when individuals have been charged together, there is a strong presumption that they should be tried together. *Russell v. United States*, 586 A.2d 695, 698 (D.C.1991). A severance may be granted, however, if trying the individuals together "prejudices any party." *Id.; Ray v. United States*, 472 A.2d 854, 856 (D.C.1984). A denial of severance will only be overturned for an abuse of discretion. *Russell, supra*, 586 A.2d at 698. In assessing a request for severance, the trial court should weigh the potential prejudice "against the considerations of judicial economy and expeditious proceedings." *Carpenter v. United States*, 430 A.2d 496, 502 (D.C.), *cert. denied*, 454 U.S. 852, 102 S.Ct. 295, 70 L.Ed.2d 143 (1981). To show an abuse of discretion, the appellant must show not only prejudice, but manifest prejudice. *(James A.) Johnson v. United States*, 596 A.2d 980, 987 (D.C.1991), *cert. denied*, 504 U.S. 927, 112 S.Ct. 1987, 118 L.Ed.2d 585 (1992); *Payne v. United States*, 516 A.2d 484, 490 (D.C.1986).

■ Mercer strongly objected to the admission of Jones' testimony concerning an alleged threat made on her life. Terrell, by contrast, was willing to chance the creation of prejudice for the benefit of impeaching Jones on the reasons she entered the witness protection program. Mercer, therefore, was deprived of his opportunity to conduct the trial

---

12. In face of cross-examination, Tamika Jones stated her reason for entering the witness protec-tion program, "Not for the money, if you think it's that. For protection of me and my son."

free of unfair prejudice. With the trial strategies of Mercer and Terrell thus in direct conflict with each other, and given the "witness intimidation" testimony from prior witnesses previously discussed, the trial judge should have granted Mercer's motion for severance, and allowed him to pursue his defense in a separate trial. We hold that her failure to do so constituted an erroneous exercise of discretion. *(James W.) Johnson, supra*, 398 A.2d at 367.[13]

## III.

### EFFECT OF THE ERRORS

Having decided that errors occurred in the exercise of discretion, however, does not end our inquiry. *(James W.) Johnson, supra*, 398 A.2d at 366. "[W]e are prepared to countenance imperfection in the trial court's exercise of discretion to enjoy more fully the advantages of making the determination discretionary." *Id.* We must now address whether the error was reversible, and thereby an abuse of discretion. *Id.* at 366.

 To determine if error is reversible, we look to the totality of the circumstances. *Id.* at 366 (citing *Springer v. United States*, 388 A.2d 846, 854–57 (D.C.1978)). Under the harmless error doctrine, with respect to a non-constitutional issue, an appellate court will reverse because of an error if the court cannot say, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Harris v. United States*, 602 A.2d 154, 159 (D.C.1992) (en banc) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). If the error "jeopardized the fairness of the proceeding as a whole, or if the error had a possibly substantial impact upon the outcome, the case should be reversed." *(James W.) Johnson, supra*, 398 A.2d at 366 (citing *Tinsley v. United States*, 368 A.2d 531 (D.C.1976); *Koppal v. Travelers Indemnity Co.*, 297 A.2d 337, 339 (D.C. 1972)).

 In making this determination, the appellate court "must weigh the severity of the error against the importance of the determination in the whole proceeding and the possibility for prejudice as a result." *(James W.) Johnson, supra*, 398 A.2d at 367 (citations omitted). "The decisive factors are the closeness of the case, the centrality of the issue affected, and the steps taken to mitigate the effects of the error." *Dyson v. United States*, 418 A.2d 127, 132 (D.C.1980) (citations omitted); *see also Settles v. United States*, 615 A.2d 1105, 1109 (D.C.1992); *Gaither v. United States*, 134 U.S.App.D.C. 154, 172, 413 F.2d 1061, 1079 (1969). We will further consider the "cumulative effect" the questions had on the outcome of the case. *See Mathis v. United States*, 513 A.2d 1344, 1349 (D.C.1986); *Powell v. United States*, 455 A.2d 405, 411 (D.C.1982).

 Standing alone, some of the "fear" evidence admitted through Cunningham, Gibson, and Washington, while erroneous, did not amount to reversible error. These are three witnesses out of over a dozen presented by the prosecution. None of the witnesses testified as to an actual threat they had received. Only Cunningham suggested that her life may be in danger. In doing so, she did not directly implicate either Mercer or Terrell. During these first two days of the trial, the mantra of witness intimidation had not yet become a theme in the trial. No more allusions were made to the spectators from Lincoln Heights. Thus, we cannot say that the evidence admitted through these three witnesses jeopardized the proceedings as a whole.

 At this point, again, due to the differences in trial tactics, our analysis becomes bifurcated. With respect to Terrell, counsel chose a strategy that risked the possibility of prejudice in order to get before the jury evidence which he thought sufficiently beneficial as to outweigh any prejudice from the government's redirect. In his cross-examination of Jones, counsel for Terrell chose to ask her about her reasons for entering the witness protection program in an attempt to

---

**13.** Mercer also sought severance based on the admission into evidence of Terrell's statement to his grandmother. We find no error. *Elliott v. United States*, 633 A.2d 27, 35 (D.C.1993).

show that she entered the program to get paid by the government. This strategy risked the admission of evidence showing that she entered the program due to an alleged threat. Terrell sought the benefit— he must take the consequences.

With respect to Mercer, counsel clearly indicated his desire to avoid any evidence that tended to show that Mercer was involved in a scheme to intimidate witnesses. When the trial court permitted the government to introduce evidence on direct examination to show that Jones entered the witness protection program due to a threat on her life, what had been merely erroneous was about to become excessive to a much greater degree. Mercer requested a severance, which was denied. Jones then testified that she heard of a threat specifically addressed against her. This lent credence to the inferences of witness intimidation made through previous allusions to the spectators from Lincoln Heights, associated with the defendants, and Cunningham's statement that "y'all might never see me again." This unfair prejudice, avoidable by severance, was not harmless. Thus the trial court abused its discretion by denying severance. *See (James W.) Johnson, supra,* 398 A.2d at 367.

## IV.

### ADMISSION OF THE VIDEOTAPE

■ Mercer and Terrell also challenge the admission of a videotaped statement Jones gave to the police. The first issue with respect to the videotape that we must address is whether it was admissible as substantive evidence. D.C.Code § 14–102(b) (1997 Repl.) sets forth the conditions under which a witness' prior statement can be admitted as substantive evidence:

> A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is (1) inconsistent with the declarant's testimony and

given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, or ... (3) an identification of a person made after perceiving the person. Such prior statements are substantive evidence.

Save for the last sentence, § 14–102(b) is virtually identical to FED. R. EVID. 801(d)(1).[14] When a witness testifies under oath and adopts a prior statement not made under oath, that prior statement becomes substantive evidence. *Byers v. United States,* 649 A.2d 279, 284 (D.C.1994); *Stewart v. United States,* 490 A.2d 619, 625 (D.C.1985).

■ In this case, the videotape of the statement made by Tamika Jones was a statement made to police officers. Jones adopted the contents of the statement, but not the videotape itself, before the grand jury while under oath. As such, it became evidence at the grand jury proceeding, and thus potentially admissible at trial under D.C.Code § 14–102(b)(1) where inconsistent with her trial testimony.

■ The statement may also be admissible under D.C.Code § 14–102(b)(3).[15] Jones stated that she saw both defendants, Mercer and Terrell, shoot Yappy. Therefore, this likely was a statement of identification made after perceiving the persons and admissible as such. *See United States v. Owens,* 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988).

Next, we must determine the proper procedure for admission of a prior inconsistent statement. While § 14–102(b) states that prior inconsistent statements are admissible as substantive evidence in some circumstances, the statute does not speak explicitly to the proper method of admitting such a statement. The common law rule regarding the proper method of introducing a witness' prior inconsistent statement is derived from *Queen Caroline's Case,* 129 Eng. Rep. 976, 2 Brod. & Bing. 284, 313 (H.L.1820):

---

**14.** Given the virtual identity of § 14–102(b) to FED. R. EVID. 801(d)(1), we may look to federal decisions construing FED. R. EVID. 801(d)(1) as authority. *See In re Mendes,* 598 A.2d 168, 169 (D.C.1991).

**15.** D.C.Code § 14–102(b) was amended by Law 11–110 to add section (3). The new section took effect April 18, 1996. This was before the commencement of the trial.

Now the usual practice of the courts below, and a practice, to which we are not aware of any exception is this; if it be intended to bring the credit of a witness into question by proof of any thing that he might have said or declared, touching the cause, the witness is first asked, upon cross-examination, whether or not he has said or declared, that which is intended to be proved. If the witness admits the words or declarations imputed to him, the proof on the other side becomes unnecessary; and the witness has an opportunity of giving such reason, explanation, or exculpation of his conduct, if any there may be, as the particular circumstances of the transaction may happen to furnish; and thus the whole matter is brought before the court at once, which, in our opinion, in the most convenient course. If the witness denies the words or declaration imputed to him, the adverse party has an opportunity, afterwards, of contending, that the matter of the speech or declaration is such, that he is not bound by the answer of the witness, but may falsify it; and, if it be found to be such, his proof in contradiction will be received at the proper season.

Thus, under the common law, counsel must first ask the witness if she made the prior statement, giving the witness sufficient facts to refresh her memory. 1 MCCORMICK ON EVIDENCE § 37, at 120 (4th ed.1992). Then, only if the witness denies making the statement, may counsel prove that the statement was made through extrinsic evidence. *Id.* In substance, our case law follows the rule in *Queen Caroline's Case. See, e.g., R & G Orthopedic Appliances and Prosthetics, Inc. v. Curtin,* 596 A.2d 530, 537 (D.C.1991); *Chaabi v. United States,* 544 A.2d 1247, 1248–49 (D.C.1988) (finding error where the prosecution is permitted to admit an out-of-court admission by the defendant on rebuttal, when the defendant has been precluded from explaining the statement on surrebuttal); *Partridge v. United States,* 39 App.D.C. 571, 580 (1913) (holding that a party admitting a prior inconsistent statement must call the witness' attention to the statement first).

■ The Federal Rules of Evidence modified the common law approach. Under FED. R. EVID. 613(b), extrinsic evidence of a prior inconsistent statement is admissible, so long as the witness is afforded the opportunity to explain or deny the statement, and the opposing party has the opportunity to interrogate the witness concerning the statement. *Queen Caroline's Case* and FED. R. EVID. 613 differ in that under the Federal rules, the party questioning the witness about the prior inconsistent statement need not show the statement to the witness first. FED. R. EVID. 613(a) advisory committee's note. Both the common law and the Federal Rules, however, require an opportunity be given to the witness to explain or deny a prior inconsistent statement before the admission of extrinsic evidence.

■ We therefore hold that while the admission of the videotape of the prior inconsistent statement under D.C.Code § 14–102(b) was not in error, the manner in which the tape was admitted was erroneous. This would be true whether analyzed under the rule of *Queen Caroline's Case,* or FED. R. EVID. 801(d)(1). In this instance, the videotape was played after Jones had left the witness stand. Jones was not confronted with the actual videotape, and counsel for Mercer and Terrell were not given the opportunity to cross-examine Jones after viewing the videotape. Rather, the videotape should have been introduced while Jones was still on the witness stand with the opportunity to explain the videotape, and for the opposing party to have the ability to cross-examine her after viewing the videotape.

We are led to this view by the plain language of § 14–102(b), which like FED. R. EVID. 801(d)(1), requires that as a precondition of the admissibility of an otherwise qualifying statement, the declarant (maker of the statement) must be a witness at trial and be "subject to cross examination *concerning the statement.*" D.C.Code § 14–102(b) (emphasis added). Stated plainly, the witness must be confronted with the prior statement by the party intending to introduce it and the opposing party given an opportunity to cross-examine on it. We note that another salutary result of such a rule was shown by Jones' adoption of her statement to the police

as part of her grand jury testimony. *See Byers, supra,* 649 A.2d at 284.

 We need not pause to consider whether this error should be evaluated by the constitutionally harmless standard of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), or the non-constitutional standard of *Kotteakos, supra,* 328 U.S. at 765, 66 S.Ct. 1239, for under either standard, we can say without hesitation that the error was harmless.

There is no question that this witness played an important part of the prosecution's case against the defendants. While other witnesses could place the defendants at the scene of the crime when the crime occurred, Jones is the only witness to positively identify both Mercer and Terrell as the ones who shot Yappy.

The prosecution sought the admission of the videotape to show the jury Jones' demeanor when she made the statement to the police. Indeed, before the trial judge, in their briefs, and during oral arguments, Mercer and Terrell claim that the only subject about which they wished to ask Jones was her demeanor in the videotape. The jury, however, was able to see Jones' demeanor in the videotape for themselves. Allowing Mercer and Terrell to ask Jones about her demeanor during the videotaped statement would have added little, if anything, to the trial.

Further, Mercer and Terrell were not denied an opportunity to cross-examine Jones on the content of her statement to the police. Trial counsel had a transcript of the statement. All that was not available to Mercer and Terrell at trial when Jones was on the witness stand was an assessment of her demeanor when she gave her statement to the police. Thus, while it was error for the trial court to allow the playing of the videotape once the witness had left the stand and not subject to cross-examination, we cannot say that the precluded line of questioning would have weakened the impact of Jones' testimony. The error was harmless.

## V.

## TERRELL'S REMAINING ARGUMENTS

 Terrell contends that the prosecution violated his due process rights by failing to turn over the contents of the grand jury testimony of Geraldine Ferrell, purporting to be an alibi, in time for Terrell to conduct an investigation and discover corroborating witnesses, in violation of *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Where prior statements of the witness are turned over to the defendant with enough time for the defendant to use them for cross-examination of the witness, however, there is no *Brady* violation. *Matthews v. United States,* 629 A.2d 1185, 1200 (D.C.1993) Here, the contents of the transcript of Ferrell's testimony was turned over to the defendants before cross-examination. The defense used the transcript both to cross-examine Ferrell, and during Terrell's case in chief, in an attempt to establish an alibi. We perceive no *Brady* violation.

 Terrell further argues that his conviction should be reversed due to ineffective assistance of counsel. To prevail on an argument of ineffective assistance of counsel, Terrell must satisfy a two-part test. First, the appellant must show that the performance of counsel was deficient. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *White v. United States,* 484 A.2d 553, 558 (D.C.1984). In assessing counsel's performance, the court must look to the overall performance. *Kimmelman v. Morrison,* 477 U.S. 365, 386, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). Mere errors of judgment or tactical decisions that go awry do not, by themselves, constitute ineffective assistance of counsel. *Curry v. United States,* 498 A.2d 534, 540 (D.C.1985); *Carter v. United States,* 475 A.2d 1118, 1123 (D.C.1984), *cert. denied,* 469 U.S. 1226, 105 S.Ct. 1222, 84 L.Ed.2d 362 (1985).

Second, the appellant must show that the deficiency prejudiced the defendant. *Strickland, supra,* 466 U.S. at 687, 104 S.Ct. 2052; *White, supra,* 484 A.2d at 558. The test for prejudice is whether there is a reasonable probability that "but for counsel's unprofessional errors, the result of the proceedings

would have been different." *Strickland, supra,* 466 U.S. at 694, 104 S.Ct. 2052.

In this instance, Terrell can show neither. The articulated reason for Terrell's dissatisfaction with his trial counsel was a disagreement with the way a witness had been cross-examined. Such a complaint amounts to nothing more than a disagreement over trial tactics. This single disagreement with trial tactics fails to show a deficiency in the overall performance of counsel.

Nor can Terrell show prejudice. Terrell has made no attempt to argue that there was a reasonable probability that the result of the trial would have been different but for this single disagreement over trial tactics.

Finally, Terrell claims the trial judge erred in failing to grant his motion for a judgment of acquittal. Given the applicable legal standard, *Zanders v. United States,* 678 A.2d 556, 563 (D.C.1996); *Curington v. United States,* 621 A.2d 819, 824 (D.C.1993), this argument is totally devoid of merit.

Accordingly, we affirm the convictions of Antonio Terrell, and reverse the convictions of Dwain Mercer. We remand the matter to Superior Court for such further proceedings against Dwain Mercer consistent with this opinion as the government elects to pursue.

*Affirmed in part; reversed and remanded in part.*